COMMONWEALTH *vs.* GREER TONEY.

Suffolk. December 7, 8, 1981. — March 18, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* New Trial, Directed verdict, Capital case. *Evidence,* Flight, Consciousness of guilt. *Identification. Witness,* Immunity.

In the circumstances, the judge in a criminal case did not abuse his discretion in concluding that no substantial issue was raised by the defendant's motion for a new trial and by the affidavits of seven witnesses offered in support of the motion and in denying the motion without an evidentiary hearing. [579-582]

Evidence at the trial of a murder case was sufficient to warrant submission of the case to the jury despite certain inconsistencies between a witness's in-court identification of the defendant and the description she had given to police shortly after the murder. [582]

At the trial of a murder case, the judge did not err in admitting evidence tending to show that the defendant was not at her home or at work during the two-week period following the murder without requiring the Commonwealth to show that the defendant knew that she was being sought by the police or to show that she was absent from her home and place of work. [582-584]

In instructing the jury in a criminal case on evidence of flight as tending to show consciousness of guilt, the judge is not required to bring to the attention of the jury the defendant's own explanation for the flight. [584-585]

The fact that a witness in a murder case told police that the defendant was the assailant only after a police officer had mentioned the defendant's name to the witness did not make the witness's in-court identification of the defendant a product of impermissible police suggestion. [586-587]

In the circumstances, the defendant in a murder case was not entitled to an order granting use immunity to a prospective witness in exchange for the witness's testimony. [587-588]

Upon review of the record in a murder case in accordance with G. L. c. 278, § 33E, this court concluded that the defendant was not entitled to any relief under that section. [588-589]

INDICTMENT found and returned in the Superior Court Department on September 6, 1978.

The case was tried before *Brogna, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Nancy Gertner* for the defendant.

*Michael J. Traft,* Assistant District Attorney (*John N. Tramontozzi,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J. On March 7, 1979, the defendant was convicted by a jury of murder in the second degree on an indictment comprehending murder in the first degree. The defendant moved for a new trial on the ground that the verdict was against the weight of the evidence. After the motion was denied, the defendant filed her claim of appeal from both the verdict and the denial of the motion. New counsel was appointed, and on April 22, 1980, the defendant filed a second motion for a new trial on the ground of newly discovered evidence. Mass. R. Crim. P. 30, 378 Mass. 900 (1979). The trial judge denied the motion on the basis of argument and affidavits and without an evidentiary hearing. An appeal from this order was filed. All appeals have been consolidated for review by this court. The appeal from the denial of the first new trial motion has not been argued, and we do not address it except in connection with our review of the record pursuant to G. L. c. 278, § 33E. Because the offense occurred before July 1, 1979, special review is available under G. L. c. 278, § 33E. *Commonwealth* v. *Davis,* 380 Mass. 1, 12-17 (1980). We affirm the judgment of conviction as well as the denials of the motions for a new trial.

We summarize the facts. At approximately 10:15 P.M. on August 13, 1978, Robin Mines, Dianne Tinsley, and the victim, Denise Curry, were on Whitfield Street in Dorchester when a car passed them driven by a female accompanied by two male passengers. Some epithets were exchanged between the victim and one of the passengers, whereupon the

car stopped and the occupants emerged. The female approached the victim, and after some words were exchanged, began hitting her repeatedly, while the two males prevented Robin Mines and Dianne Tinsley from interfering. At some point, one of the men pulled the assailant off the victim and said, "Toney, let her go, let her go." As the assailant relinquished her hold, Mines observed something "long" and "bloody" in the hand of the assailant. The two men and the assailant went back to the car and drove off. The victim staggered a few steps and collapsed; she died shortly thereafter of a stab wound to the heart. A medical examiner testified that the wound could have been caused by a knife or a pair of scissors.

Shortly after the incident, Mines described the attacker to the police as a black woman, five feet, ten inches tall, weighing 165 pounds, and wearing an "Afro" type hair style. Tinsley also described the attacker as tall and wearing an Afro. Mines told the police that she recognized the assailant as one of the Toney sisters, and directed them to the home of Dorcas Toney, a sister of the defendant. The next day, Mines and Tinsley went with the police to see Dorcas Toney. After Dorcas was observed by Mines and Tinsley, they told the police she was not the assailant. Shortly thereafter one of the police officers mentioned the defendant's name, whereupon Mines told them that that was the one who had committed the crime. No in-person or photographic identification procedure involving the defendant was conducted prior to trial.

The defense at trial was that of mistaken identity. There are approximately ten Toney sisters,[1] and the defendant introduced evidence suggesting that one of her sisters was the proper suspect, and not the defendant. There was unrebutted evidence that the car involved belonged to the defendant. It was shown at trial that the defendant was five feet, six inches tall, weighed 135 pounds, and usually, if not al-

---

[1] The testimony was conflicting regarding whether there are nine, ten or eleven sisters in the Toney family.

ways, wore her hair tied back. Doris, on the other hand, was described as five feet, nine inches tall, between 165 and 170 pounds, and wearing an Afro, a description corresponding closely to the one that Mines and Tinsley had given to the police on the night of the murder. Despite these discrepancies, Mines testified positively that the defendant was the assailant, stating that she knew the defendant from having attended a Toney family party, and having frequented the same skating rink as the defendant. Dianne Tinsley could not provide a positive identification, other than by saying that, as compared with the assailant, the defendant was "the right size."

As an alibi, the defense introduced evidence to show that on the evening of the incident, members of the Toney family had visited two sisters incarcerated at the Massachusetts Correctional Institution at Framingham. Several members of the family testified that, although the defendant drove her car to the prison, she returned with her father in his car directly to her sister Maryse Beane's house where she stayed until 2 A.M. The evidence indicated that Doris had left the prison beforehand in the defendant's car, accompanied by the defendant's fiancé, brother-in-law, and several other family members. This was corroborated by the testimony of the correctional officer who was checking in visitors that evening. The officer testified that the defendant had put a pair of scissors and other belongings into a locker, but that another family member, who the defendant argues was Doris, emptied the locker and left the prison before the defendant did. The officer remembered the defendant's being angry over the fact that someone else had emptied her locker. There was evidence that the defendant had put her car keys into her locker when she arrived at the prison. Finally, the correctional officer stated that the defendant wore her hair rolled up in a bun that evening. On rebuttal the prosecution introduced in evidence visitation records of the prison which did not list a Doris Toney as having been there that evening. There was also evidence, however, that these records were not always accurate.

The defendant raises five claims of error. These relate to (1) the motion for a new trial on the basis of newly discovered evidence; (2) the defendant's motion for a directed verdict at the close of the Commonwealth's case; (3) the admission at trial of evidence of flight by the defendant, and the instructions to the jury relating to this evidence; (4) the admission at trial of Mines's in-court identification of the defendant; and (5) the defendant's request for an order granting Doris Toney use immunity. For the reasons set forth below we conclude that there has been no error, and that relief under § 33E is not appropriate.

1. *Motion for a New Trial on the Ground of Newly Discovered Evidence.*

The defendant offered the affidavits of seven witnesses in support of her motion for a new trial. She claims that the judge erred in denying the motion without an evidentiary hearing.

Rule 30 (b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 900 (1979), provides that a new trial may be granted "if it appears that justice may not have been done." The motion may be decided on the basis of affidavits and without an evidentiary hearing "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). "The decision on a motion for a new trial, as well as the decision whether to decide the motion on the basis of affidavits or to hear oral testimony, is left largely to the sound discretion of the judge. *Commonwealth* v. *Cook*, 380 Mass. 314, 320 (1980). *Commonwealth* v. *Heffernan*, 350 Mass. 48, 53-54, cert. denied, 384 U.S. 960 (1966)." *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). We examine the affidavits to determine the seriousness of the issues asserted and the adequacy of the defendant's showing on those issues. *Id.* at 257-258. There was no error in the judge's denial of the motion without an evidentiary hearing.

*Affidavits of Ralph Jackson and Jeffrey Beane.* Both Ralph Jackson and Jeffrey Beane stated in their affidavits that they were passengers in the car driven by the assailant

and that they witnessed the fight that resulted in Denise Curry's death. Ralph Jackson is the defendant's fiancé, and Jeffrey Beane is the defendant's brother-in-law. They both stated that the defendant was not present when the incident occurred. However, they did not volunteer any information concerning the identity of the assailant. The judge was not required to believe their statements. *Commonwealth* v. *Cassesso,* 360 Mass. 570, 575 (1971), judgment vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972). In light of the close relationship between the affiants and the defendant, and their refusal to identify the person who they say was the actual assailant, we think the judge was justified in concluding that their testimony would not be credible and that therefore no substantial issue was raised by these affidavits. We do not decide whether the testimony of Jackson and Beane was unavailable at the time of the trial, or whether it could not have been procured with due diligence.[2]

*Affidavits of Cynthia Bruton and Irving E. Laval.* Cynthia Bruton shared an apartment with Robin Mines. Her affidavit stated that before the defendant's trial Robin Mines told her that she (Mines) "knew it wasn't Greer [the defendant], but if Greer was going to be funny and take the weight for someone else, Robin would say it was Greer, [because] somebody was going to pay for Denise's death." Laval, a boy friend of Mines, stated in his affidavit that "Robin told me that Denise Curry had been stabbed by Tracy Toney, with a butcher knife and that Robin had seen it." When Laval challenged her identification of Tracy as the assailant, Mines replied, "Well, if it wasn't Tracy, it was

---

[2] At trial Beane's wife implied that she had not seen him for at least six months. There is nothing else to indicate whether others knew of his whereabouts, or whether "due diligence" was exercised to locate him and procure his testimony. See *United States* v. *Wright,* 625 F.2d 1017, 1019 (1st Cir. 1980). Jackson invoked the Fifth Amendment and refused to testify at the trial. Compare *Commonwealth* v. *Grace,* 370 Mass. 746, 752 (1976), with *United States* v. *Guillette,* 404 F. Supp. 1360, 1372-1373 (D. Conn. 1975), and *Ledet* v. *United States,* 297 F.2d 737 (5th Cir. 1962).

her other sister. . . . It's one of them, I know that much
and they're going to pay for this."

The judge ruled that this evidence was merely cumula-
tive, and that the defendant had failed to show that these
witnesses were unavailable at trial. We agree. The testi-
mony is hearsay, and is admissible only for its impeachment
value. See generally P.J. Liacos, Massachusetts Evidence
141-142 (5th ed. 1981). It is cumulative of other evidence
that was adduced at trial to impeach Mines's testimony.
Newly discovered evidence that tends merely to impeach
the credibility of a witness will not ordinarily be the basis of
a new trial. *Commonwealth* v. *Cassesso, supra* at 576, and
cases cited. See *Commonwealth* v. *Stewart,* 383 Mass. 253,
258 (1981). In addition, the defendant has not shown that
the affiants were unavailable at the time of trial, or that the
evidence could not have been procured by due diligence.
See *Sharpe, petitioner,* 322 Mass. 441, 444 (1948). The de-
fendant had the burden of proving these facts. *Common-
wealth* v. *Levia, ante* 345, 352 (1982). *Commonwealth* v.
*Bernier,* 359 Mass. 13, 15 (1971). The defendant asserted
only that these witnesses did not come forward until after
the trial. The judge did not abuse his discretion in conclud-
ing that this was insufficient to establish the unavailability
of the witnesses. Cf. *United States* v. *Young,* 426 F.2d 93,
95 (6th Cir.), cert. denied, 400 U.S. 828 (1970). It is true
that the judge would have been fully warranted in granting
the defendant's motion for a new trial on the basis of these
affidavits. However, we cannot say, especially in light of
the peculiar circumstances of this case (which we discuss in
the last part of this opinion), that the judge exceeded his dis-
cretion in concluding as he did.

*Affidavits of Mary Cournoyer, Gertrude Apkarian, and
Willie Curry.* Mary Cournoyer and Gertrude Apkarian
were employed at the Massachusetts Correctional Institu-
tion, Framingham, at the time of the incident. According
to their affidavits, their testimony would tend to establish
the time when the defendant left the prison on August 13,
that she did not have an Afro hair style that evening, and

that the visitation records of the prison were not always accurate. The judge was correct in concluding that this evidence was merely cumulative of evidence that had already been adduced at trial. The affidavit of Willie Curry, the defendant's hairdresser, was also cumulative, inasmuch as it only tended to prove that the defendant did not wear an Afro.

2. *Motion for Directed Verdict.*

After the close of the Commonwealth's case, the defendant made a motion for a directed verdict, which the judge denied. The defendant contends that the denial of the motion was error.

Applying the standard set forth in *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979), we must determine whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 815 (1980), and cases cited.

We conclude that the evidence was sufficient to warrant the submission of the case to the jury. The witness Robin Mines made a positive in-court identification of the defendant as the assailant. She testified that she had seen the defendant on a number of occasions before the murder — several times at a skating rink, and once at a party. She also testified that she knew the defendant and several other Toney sisters by sight. The fact that Mines's in-court identification was inconsistent with the description given to the police shortly after the murder does not render the evidence insufficient. The credibility of a witness is for the jury to decide. There was no error in denying the motion for a directed verdict. *Commonwealth* v. *Vitello,* 376 Mass. 426, 457-461 (1978). *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 405-411 (1978).

3. *Evidence of Flight.*

Over the objection of the defendant, the Commonwealth introduced evidence that several law enforcement officers tried to locate the defendant by going to her house on several occasions, and by talking, either by telephone or in

person, to four of the defendant's sisters and one of her cousins. The defendant countered with evidence tending to show that she would have been at work during the times when the police came to her house, and that she did not know until just before she surrendered herself to the police that she was being sought in connection with the murder. In rebuttal, the Commonwealth introduced evidence suggesting that the defendant failed to report to work after the murder.

The defendant concedes that evidence of flight is admissible to prove consciousness of guilt. *Commonwealth* v. *Gilday*, 367 Mass. 474, 496 (1975). *Commonwealth* v. *Haney*, 358 Mass. 304, 306 (1970). *Commonwealth* v. *Geagan*, 339 Mass. 487, 512, cert. denied, 361 U.S. 895 (1959). She argues, however, that in this case the evidence was not probative of consciousness of guilt because the Commonwealth failed to introduce sufficient evidence to prove (a) that she knew that she was being sought by the police or (b) that she was absent from her home and place of work. First, we do not think it necessary for the Commonwealth to prove that at the time of flight the accused knew of police pursuit, in order for evidence of flight to be admissible. Evidence that a person flees from the scene of a crime or from his usual environs may be probative of a consciousness of guilt regardless of whether he has actual knowledge that he is being sought by the police. 2 J. Wigmore, Evidence § 276, at 129 (Chadbourn rev. ed. 1979). Moreover, even if we were to accept the defendant's premise that such proof is necessary, the Commonwealth's evidence of repeated police visits to the defendant's home and inquiries made of relatives was sufficient to permit an inference that the defendant did in fact know that the police were looking for her. Second, there is no merit to the defendant's suggestion that the Commonwealth was required to make a preliminary showing that the defendant was in fact absent from her usual environs before this evidence could be admitted before the jury. The Commonwealth's evidence was relevant to show that the defendant was not at her home or at work during the two-

week period following the murder, and that was enough to establish its admissibility. See *Commonwealth* v. *Tolliver*, 119 Mass. 312, 315 (1876). It was open to the defendant to rebut this evidence, which she did, and it was for the jury to determine which explanation was most credible.

The defendant also argues that the judge erred in his instructions to the jury on evidence of flight by failing to bring to their attention the defendant's innocent explanation for the alleged flight.[3] The defendant did not object to this portion of the charge. Our review under G. L. c. 278, § 33E, is therefore limited to determining whether there is substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Tavares, ante* 140, 147-148 (1982), and cases cited. However, because the issue has not previously been addressed fully by this court, we make some observations relative to jury instructions on evidence of flight.[4]

There are two assumptions that underlie the inference of guilt that may be drawn from evidence of flight, concealment, or similar acts. The first assumption is that a person who flees or hides after a criminal act has been committed does so because he feels guilt concerning that act. The second is that one who feels guilt concerning an act has committed that act. 1 J. Wigmore, Evidence § 173 (3d ed.

---

[3] The judge instructed the jury as follows: "Now, there has been mention made by each side of evidence of the type that the law calls 'consciousness of guilt,' and that is evidence of an accused, a person who suspects he or she is accused, whether or not they try to hide, conceal, or to prevent their being detected or convicted. I want to caution you however, that you should never convict a person of any crime based on evidence of consciousness of guilt alone. The reason is there are equally valid reasons for an innocent person to do what he or she may do.

"Evidence, if you believe it, of consciousness of guilt may be used, however, with other evidence in the case in determining for yourselves whether or not the defendant is guilty beyond a reasonable doubt."

[4] Although our comments speak in terms of evidence of flight or concealment, we note that they are for the most part applicable to other types of evidence offered to prove consciousness of guilt, for example, false statements made to police, destruction or concealment of evidence, or the bribery or threatening of a witness.

1940). See *Miller* v. *United States*, 320 F.2d 767, 770 (D.C. Cir. 1963) (separate opinion by Bazelon, C.J.). The first assumption has been questioned by a number of courts, which have observed that a person's flight, concealment, or other avoidance of arrest may often be prompted by something other than feelings of guilt.[5] In the instant case, for example, the defendant could have been absent from her home and place of work for reasons consistent with her innocence: she may have wanted to avoid disclosing the whereabouts of her sister Doris, or she may have had a strong aversion to police authorities. The second assumption has also been criticized, in that feelings of guilt may be present without actual guilt in neurotic, as well as so called "normal," people. *Miller* v. *United States, supra* at 771-773.

We think that a judge should instruct the jury (1) that they are not to convict a defendant on the basis of evidence of flight or concealment alone (see, e.g., *Commonwealth* v. *Smith*, 368 Mass. 126, 129 [1975]), and (2) that they may, but need not, consider such evidence as one of the factors tending to prove the guilt of the defendant. We do not think it necessary, as suggested by the defendant, that the judge bring to the attention of the jury the defendant's own innocent explanation for the alleged flight, although the judge may in his discretion do so. A general instruction of the type outlined above will suffice.

It is clear that the judge did not err in instructing the jury. The charge adequately cautioned the jury concerning the equivocal nature of evidence of flight.[6]

---

[5] E.g., *Wong Sun* v. *United States*, 371 U.S. 471, 483-484 n.10 (1963); *Alberty* v. *United States*, 162 U.S. 499 (1896); *Hickory* v. *United States*, 160 U.S. 408 (1896); *United States* v. *Myers*, 550 F.2d 1036, 1050 (5th Cir. 1977); *Austin* v. *United States*, 414 F.2d 1155 (D.C. Cir. 1969); *Miller* v. *United States*, 320 F.2d 767, 770-771 (D.C. Cir. 1963) (separate opinion by Bazelon, C.J.); *Vick* v. *United States*, 216 F.2d 228 (5th Cir. 1954); *Ryan* v. *People*, 79 N.Y. 593, 601 (1880).

[6] In light of our discussion, it would be appropriate for a judge, if requested, to caution the jury on the dangers inherent in drawing the infer-

4. *Identification Testimony.*

The evidence at trial indicated that Robin Mines told the police that the defendant was the attacker only after one of the police officers had mentioned the name Greer Toney to her. The defendant argues that Mines's in-court identification was for this reason a product of impermissible police suggestion. Analogy is drawn to cases involving one-on-one photographic or in-person confrontations. See, e.g., *Commonwealth* v. *Venios*, 378 Mass. 24 (1979); *Commonwealth* v. *Botelho*, 369 Mass. 860, 867 (1976). Trial counsel did not object to the in-court identification, presumably for tactical reasons. See *Commonwealth* v. *Underwood*, 358 Mass. 506, 509-512 (1970); *Commonwealth* v. *Meggs*, 4 Mass. App. Ct. 773 (1976). Cf. *Commonwealth* v. *Levia, ante* 345, 353 (1982). However, we consider the defendant's contention pursuant to our § 33E powers.

The defendant does not cite, nor have we found, any cases holding that the mentioning of a name by police may by itself be so suggestive as to render any subsequent identification excludable.[7] Assuming that it may, however, the record in this case does not show that the mention of the defendant's name was unnecessarily suggestive. The defendant bears the burden of establishing that a confrontation is unnecessarily suggestive. *Commonwealth* v. *Venios, supra* at 26-27. *Commonwealth* v. *Botelho, supra.* The tran-

---

ence of guilt from the fact of flight. When such a request is made, the judge should explain to the jury, in appropriate language, first, that since there are numerous reasons why an innocent person might flee, flight or similar conduct does not necessarily reflect feelings of guilt. Second, he should explain that, even where a person's flight does demonstrate feelings of guilt, it does not necessarily mean that the person is in fact guilty, because feelings of guilt are sometimes present in innocent people. See *Miller* v. *United States, supra* at 773. Such an elaboration, if given prior to the required instructions, might help the jury to understand better the required instructions.

[7] The defendant relies on *Commonwealth* v. *Moon*, 380 Mass. 751, 756-759 (1980). However, that case involved a one-on-one photographic confrontation that was held unnecessarily suggestive in part because of a comment made by the police ("That sounds like Andy Moon").

script shows only that the police officer "mentioned" the defendant's name, whereupon Mines responded that that was the person who attacked the victim. There is nothing to indicate that the police officer suspected the defendant as the assailant when she mentioned her name, or that any such suspicion was conveyed to Mines.[8] These facts do not establish an unnecessarily suggestive "confrontation." Since the mentioning of the defendant's name has not been shown to be unnecessarily suggestive, no taint attached to the in-court identification. We need not consider, therefore, whether the identification was "reliable," and, if so, whether it would be constitutionally admissible despite an impermissibly suggestive confrontation. See *Commonwealth* v. *Storey*, 378 Mass. 312, 319-320 (1979); *Commonwealth* v. *Venios, supra*, and cases cited.

5. *Use Immunity.*

The defendant filed a motion asking the judge for an order granting use immunity to Doris Toney in exchange for her testimony. As grounds for the motion, she asserted that Doris Toney would confirm the fact that the defendant was not at the scene of the murder and did not stab the victim. The judge took no action on this motion. The defendant has renewed her motion in this court.

This court has not decided whether the courts of this Commonwealth have the authority to grant immunity to a defense witness over the objection of the prosecutor,[9] and

---

[8] Rather, the transcript suggests that the defendant's name was mentioned only because the police officer had talked to the defendant's children several months earlier in connection with an unrelated incident, and therefore knew the defendant as one of the Toney sisters.

[9] Massachusetts has a statutory procedure for the granting of immunity to witnesses. See generally G. L. c. 223, §§ 20C-20I. Under the statute, immunity may be granted to a witness appearing before the grand jury by a Justice of the Supreme Judicial Court at the request of either the Attorney General or a district attorney. G. L. c. 233, §§ 20C & 20E. A witness who testifies at trial may be granted immunity only if he has previously been granted immunity with respect to his testifying or producing evidence before a grand jury. G. L. c. 233, § 20F. This court has not found it necessary to decide whether this statutory scheme establishes the exclusive procedure by which a Superior Court judge may grant immunity to a

we express no opinion on whether such authority exists. It is the defendant's contention that she has a constitutional right to procure the testimony of Doris Toney by means of a court-ordered.grant of use immunity. Regardless of whether such a constitutional right exists, she has not presented to this court or to the trial judge the factual basis necessary to support her motion. Doris Toney has not come forward with any statement, sworn or unsworn, that she intends to invoke her privilege against self-incrimination, or that she will testify as to facts exculpatory of the defendant if she is granted immunity. Her whereabouts are not known to the prosecutor, but presumably are known to the defendant. See *Schipani* v. *Commonwealth*, 382 Mass. 685 (1980), and cases cited. In addition, the defendant has failed to argue, much less show, that Doris's testimony would establish grounds for a new trial. It does not appear that the evidence is newly discovered, and, as explained below, it does not appear that given the circumstances of the case, "justice may not have been done." Mass. R. Crim. P. 30 (b). Absent grounds for a new trial, no purpose would be served by granting Doris Toney immunity.

6. *Review under G. L. c. 278, § 33E.*

Although the defendant has not specifically requested it, we are obliged pursuant to § 33E to review the whole case on the law and the facts to ensure that the result is consonant with justice. *Commonwealth* v. *Tavares, ante* 140, 157-158 (1982). *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980). We have reviewed the record, and we conclude that relief under § 33E is not appropriate here.

The defendant's principal argument is that a mistake in the identity of the assailant has occurred. Yet it is apparent from the record that if indeed Doris was the assailant, and not the defendant, the defendant had the means at her disposal to demonstrate her own innocence by establishing the

---

witness. See *Commonwealth* v. *Simpson*, 370 Mass. 119, 121 (1976). See also *Grand Jurors for Middlesex County for the Year 1974* v. *Wallace*, 369 Mass. 876, 879 n.4 (1976).

guilt of her sister. Significantly, the defendant did not attempt to introduce any evidence that would have directly implicated Doris Toney. While various members of the Toney family testified, none was asked any specific questions about Doris Toney that would have shed light on whether she was in fact the assailant.[10] Moreover, the defendant introduced at trial a photograph of Doris Toney, but did not show it to either Robin Mines or Dianne Tinsley to establish that Doris Toney was indeed the murderer. The defendant gambled by omitting this evidence, and lost. Her trial was fair, and the verdict was not "against the weight of the evidence considered in a large or nontechnical sense." *Commonwealth* v. *Cadwell*, 374 Mass. 308, 316 (1978), quoting from *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977).

On appeal the defendant pursues the same tactic as at trial. Nowhere does she provide the evidence necessary to establish Doris's guilt. It is obvious, however, that if her contention is true, she has the means to do so. This selective offering of evidence renders her claim of mistaken identity lacking in credibility. Moreover, the defendant's request that Doris Toney be granted immunity for her testimony indicates that the defendant is playing what the judge aptly called a "shell game" with the Commonwealth. This we cannot allow.

We affirm the judgment of conviction and the orders of the trial judge denying the defendant's two motions for a new trial. The motion for an order granting use immunity to Doris Toney is also denied.

*So ordered.*

---

[10] A confession made by Doris might well have been admissible under the hearsay exception for declarations against interest, provided corroborating circumstances clearly indicated its trustworthiness. *Commonwealth* v. *Carr*, 373 Mass. 617 (1977). Evidence of flight on the part of Doris might also have been introduced.