COMMONWEALTH vs. ROBERT EARL SAWYER.

Suffolk. December 8, 1982. — July 14, 1983.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Search and Seizure,* Arrest. *Arrest. Evidence,* Other offense, Consciousness of guilt, Admissions and confessions. *Practice, Criminal,* Voluntariness of statement.

A search in Maine, conducted by police of that State, of a defendant's motel room, van, and rented automobile incident to his warrantless arrest following receipt of teletype information from New York that a warrant had been issued for the defendant's arrest pursuant to a grand jury indictment and that New York would seek his extradition, complied with the requirements of Maine law, including the Uniform Criminal Extradition Act, and, consequently, no substantial risk of a miscarriage of justice resulted from the admission in evidence, at the defendant's Massachusetts trial on an unrelated charge, of material seized during the Maine search. [692-696]

Evidence of other misconduct by a defendant, accompanied by adequate limiting instructions, was properly admitted at his trial for murder, as relevant to issues including the defendant's financial situation before and after the murder, his relationship to the principal prosecution witness, and his motive for establishing a new identity. [696-698]

At a murder trial, an inadvertent reference in testimony by a Maine police officer to the defendant's arrest on an unrelated charge presented no substantial risk of a miscarriage of justice nor necessitated allowance of the defendant's motion for a mistrial. [698-699]

Evidence that the defendant at a murder trial attempted to escape from custody shortly before his trial was scheduled to begin and that, when apprehended, he possessed a written description of the Commonwealth's principal witness, was not rendered inadmissible by any possible prejudice that might result if the defendant adduced a motive for the flight unrelated to the charge being tried, but was properly admitted as showing consciousness of guilt of the crime for which he was on trial. [700-702]

At a criminal trial, the judge, who, after voir dire, had ruled that the defendant had waived his Miranda rights and voluntarily made certain statements to Maine police, was not required to instruct the jury in accordance with the Massachusetts "humane practice" respecting

voluntariness of the statements, where the defendant never made voluntariness a live issue in the trial. [702-704]

INDICTMENT found and returned in the Superior Court Department on August 7, 1980.

The case was tried before *Brogna, J.*

*Philip X. Murray* for the defendant.

*Paul W. Shaw,* Special Assistant Attorney General, for the Commonwealth.

LYNCH, J. The defendant Robert Earl Sawyer appeals from a conviction of murder in the first degree, claiming as error the trial judge's failure to suppress certain evidence, the admission of evidence of the defendant's past misconduct, and the admission of evidence of his attempted escape from custody. The defendant also assigns as error the judge's failure to instruct the jury on the voluntariness of statements the defendant made to a police officer, or in the alternative that we review such failure pursuant to G. L. c. 278, § 33E. Lastly, the defendant argues that based upon the weight of the evidence he should be granted a new trial or other relief pursuant to G. L. c. 278, § 33E. Finding no error warranting reversal, nor any circumstances warranting an exercise of our powers under G. L. c. 278, § 33E, we affirm the judgment.

On the afternoon of June 21, 1977, the police department of Portland, Maine, received a telephone call from the office of the sheriff of Chautauqua County, New York, advising that arrest warrants for murder and armed robbery had been issued against the defendant in connection with the robbery of a store in western New York State, during which a nineteen year old clerk was killed. The sheriff believed the defendant to be in the Portland area, driving a 1977 green van with New York license plates. At approximately 6:30 P.M., the Portland police received the following teletype message from the Chautauqua County authorities: "Request your department attempt to locate a Robert Earl Sawyer, white male, date of birth 11/9/46, address unknown, your city. Subject is wanted for murder this

department. Subject is, height six feet, weight 184, eyes brown, hair brown, dark complexion, medium build, heavy moustache. Operating a '77 Ford van, color green, New York registration 261 ZHD, damage to right front. Warrants issued. One count murder, second; one count armed robbery. Indictment No. 77-120. Will extradite. Should be considered armed and dangerous. This message confidential."

A number of Portland police officers were assigned to assist in locating the defendant. That afternoon the van was spotted at a local automobile repair shop. The proprietor produced a repair order bearing the defendant's name. Through their investigation, the police discovered that the defendant had registered for the night of June 20 at a large motel complex in the city. At approximately 8 P.M., police arrived at the motel and telephoned the defendant's room. The telephone went unanswered. The officers entered the empty room with a passkey supplied by a member of the management staff. Two officers remained in the room and several others were stationed in various parts of the motel. When the defendant opened the door of the room at approximately 12:20 A.M. the officers inside immediately arrested him. The police inspected a bag the defendant had been carrying and found a loaded Browning nine millimeter automatic pistol. All the defendant's possessions in the room, including several identification cards, bearing the names Kenneth Faucheux and Arthur J. Rossi, found under a mattress, were taken to the police station. Police also impounded the van, which contained nautical items, and impounded as well a rented automobile which the defendant had been driving in Maine. Later that morning the defendant was arraigned in the District Court for Cumberland County in Maine. He was held for rendition until extradited to New York, where he was convicted of murder and sentenced to a term of from twenty-five years to life imprisonment.[1]

---

[1] The judgment was reversed and a new trial was granted on the ground that the defendant, who had maintained that he was not competent to

Two years later, on August 11, 1979, one Thomas Ewing told a Portland police officer that a body was buried in a heavily wooded area of Naples, Maine. The following day, Maine State police officers located the partially decomposed body, later identified as Kenneth W. Faucheux of Bayonne, New Jersey. Dr. Henry F. Ryan, chief medical examiner for the State of Maine, concluded that the death was a homicide and that Faucheux had died as a result of multiple fractures of the skull, consistent with repeated blows to the head with a blunt instrument. Ewing testified that he told the police that he had helped the defendant drag the body to the burial site, and that the defendant told him that he had killed Faucheux in Boston.

During the police investigation of this murder, a Maine State trooper interviewed the defendant at the New York State prison in Auburn. The defendant stated that he had first met the victim in 1966 at a New Hampshire correctional facility, that they had met again in Portland, Maine, in June, 1977, and that about June 4 he had driven Faucheux in his van to Bayonne, New Jersey so that Faucheux could visit friends and get some belongings. They had started back to Maine about June 7, and stopped in Boston about 6 P.M. that evening. The defendant dropped Faucheux off at North Station with the agreement that the two would meet there at 9 P.M. Faucheux did not reappear, and after waiting until 2 A.M. the defendant left for Maine alone.

The defendant was indicted by a Suffolk County grand jury on August 7, 1980, for the murder of Kenneth W. Faucheux. The judge denied the defendant's pretrial motions to suppress with the result that the Browning automatic pistol and the items of identification belonging to Faucheux seized in the motel room, photographs of the nautical items found in the van, and evidence that he had rented an automobile while in Maine, were admitted in evidence.

represent himself, was deprived of his right to counsel at trial. *People* v. *Sawyer,* 83 A.D. 2d 205 (1981), aff'd, 57 N.Y. 2d 12 (1982) (four to three decision).

At trial Ewing testified that the defendant had told him that Faucheux "was killed in Boston. . . . That he hit him in the head with a hammer several times and that he didn't want to die. He died awful hard," so that the defendant "had to pound a screwdriver through his chest." Ewing stated that the defendant had killed his victim "[f]or money," and that the defendant said there had been no place to get rid of the body en route from Boston to Maine, so he had brought it in his van to Ewing's "camp" (tract with cabin and tents) in Naples in order to bury the victim where no one would find the body. Ewing testified that after he helped the defendant bury Faucheux's body, the defendant cleaned out the rear of his van. He removed a section of blood-soaked carpeting and wrappers from sandwiches the defendant had bought along the way. He put these items in a bag and threw it into the grave.[2] Ewing saw nautical items in the van, and the defendant told him they had belonged to "the dead man from New Jersey." The defendant also told Ewing that if Ewing told anyone about the body, he "wouldn't get a chance to leave the state." Ewing also testified that the defendant had little money when he first arrived in Maine, and that he accompanied the defendant while he burglarized a house. But after he returned from New Jersey, the defendant had quite a few $100 bills.

The Commonwealth also offered the testimony of Paul Kunz, a friend of the victim. Kunz had at various times been incarcerated with the defendant, Faucheux, and perhaps with Ewing. Kunz said that Faucheux had derived his income from salvaging nautical items from ships in New Jersey and later selling them. Faucheux frequently came to

---

[2] When the police discovered the grave, a trash bag was found on top of the body. The contents of the bag included a piece of carpet with traces of blood with one light-brown human head hair, sandwich cartons, six work orders from a Sears Roebuck & Co. store in Lakewood, New York, where the defendant had worked as a carpet installer, and a receipt from a Jamestown, New York, motel which was dated May 4, 1977, and which bore the defendant's name.

.

Maine to visit Kunz. In late May or early June, 1977, Faucheux stayed in Maine with Kunz's brother, Nicholas Sangillo. The defendant moved from Ewing's camp site to stay with Sangillo at about the same time. Kunz saw the defendant and Faucheux depart from New Jersey in the green van. On his return to Maine, the defendant told Kunz he had left Faucheux in Charlestown, Massachusetts, or at North Station, and that Faucheux had not reappeared. Sangillo testified that he saw the defendant in Maine approximately one week later and nearly every day for approximately two weeks thereafter. During this time the defendant had a substantial amount of money and he gave Sangillo $140 or $150 to buy marihuana. The defendant also took Faucheux's Browning automatic pistol from Sangillo's apartment, saying that Faucheux "didn't need it anymore where he was."

The defendant testified that he had left Boston for Portland about May 28, 1977, in order to commit several burglaries with Paul Kunz. He met with Kunz and Faucheux in Maine and they discussed the planned burglaries. He also met Ewing in Portland, gave him a ride to Ewing's camp, and cleaned out his van there, placing the trash bag next to Ewing's cabin. The defendant stated that on the way from New Jersey he stopped in Watertown, Massachusetts. Soon thereafter he observed Faucheux talking to a police officer in Watertown. Suspicious of Faucheux, the defendant alerted Kunz on his arrival in Maine. Kunz later met the defendant and told him the "situation was taken care of." According to the defendant, Faucheux's body was in the back of Kunz's vehicle, and the defendant helped Kunz to place it in the defendant's van. Kunz and the defendant agreed upon the story the defendant later told the Maine State trooper about separating from Faucheux in Boston.[3] While the defendant was burying the body at Ewing's camp, Ewing came upon him.

---

[3] The defendant originally summonsed Paul Kunz from Arizona to testify at the trial. When Kunz arrived, defense counsel conferred with him,

The defendant also sought to impeach Ewing's testimony by introducing evidence that Ewing was an alcoholic with potential criminal liability, and by pointing out inconsistencies in Ewing's testimony, such as his statement that the defendant told him he pounded a screwdriver through Faucheux's chest.[4]

1. *Admission in evidence of the fruits of the Maine search.* The defendant's pretrial motions alleged that the searches of the motel room, the van, and the rented automobile after his 1977 arrest by the Portland, Maine, police were carried out without search warrants and without probable cause. On appeal, the defendant's sole challenge is that the searches were conducted as a result of an improper warrantless arrest, and that evidence derived from them should have been suppressed at this trial as "fruits of the poisonous tree." *Wong Sun* v. *United States,* 371 U.S. 471, 484-485, 488 (1963). The defendant thus presents a new theory as to why the evidence should have been suppressed, one not properly before the judge. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979). This he cannot do. *Commonwealth* v. *Lewis,* 346 Mass. 373, 383 (1963), cert. denied, 376 U.S. 933 (1964). We therefore review this claim only to determine whether there has been a substantial risk of a miscarriage of justice. G. L. c. 278, § 33E. *Commonwealth* v. *Porter,* 384 Mass. 647, 655-656 (1981). See *Commonwealth* v. *Tyree,* 387 Mass. 191, 213-214 (1982), cert. denied, 459 U.S. 1175 (1983); *Commonwealth* v. *Tavares,* 385 Mass. 140, 149 (1982); *Commonwealth* v. *Scala,* 380 Mass. 500, 510 (1980). We conclude that there was no substantial risk of a miscarriage of justice as a result of the failure to suppress this evidence.

Contrary to the defendant's assertion, the warrantless arrest was valid. In determining the validity of an extraterri-

and, with the defendant's consent, decided not to call him to testify. The Commonwealth then called Kunz as a witness for the prosecution.

[4] The defendant pointed to the lack of medical evidence that Faucheux had been stabbed in the chest. The Commonwealth, however, did not rely on Ewing's testimony in that respect.

torial arrest, we look to the law of the State in which the arrest was made. *Commonwealth* v. *Gullick,* 386 Mass. 278, 281 (1982), and cases cited. Like the vast majority of the States, Maine has adopted the Uniform Criminal Extradition Act. Me. Rev. Stat. Ann. tit. 15, §§ 201-229 (1980) (hereinafter tit. 15).[5] Section 214 of the Maine act, which is substantially similar to § 14 of the Uniform Criminal Extradition Act, (11 U.L.A. 252 [Master ed. 1974], superseded by 11 U.L.A. 104 [Supp. 1983]), provides: "The arrest of a person may be lawfully made by an officer or a private citizen without a warrant, upon reasonable information that the accused stands charged in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one year; but when so arrested, the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in section 213 [issuance and execution of fugitive warrants]. Thereafter his answer shall be heard as if he had been arrested on a warrant."[6]

---

[5] In construing our own version of the Uniform Act we have said: "As regulated by the Uniform Act in harmony with the Federal Constitution (art. 4, § 2, cl. 2) and the Federal statute (18 U.S.C. § 3182 [1970]), interstate extradition is a summary executive procedure whose effect is essentially to enlarge the territorial area for lawful arrest, the asylum jurisdiction being added to the demanding jurisdiction." *Maldonado, petitioner,* 364 Mass. 359, 361-362 (1973). The Supreme Judicial Court of Maine, in its review of certain of the present defendant's extradition proceedings, recited a familiar rule of construction of the act: "The legislature mandates, in no uncertain terms, that Maine's Act, expressly denominated the 'Uniform Criminal Extradition Act,' 15 M.S.R.A. § 229 (1964), 'shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it.' . . . As recognized by that record [number] of enactments, the need for uniformity among the states is particularly acute in this area of law, involving as it does principles of interstate comity under an umbrella of controlling federal law." *Sawyer* v. *State,* 382 A.2d 1039, 1041 (Me. 1978).

[6] To our knowledge, the Supreme Judicial Court of Maine has not had occasion to review an arrest pursuant to tit. 15, § 214. However, that court noted, in a case involving another section of its Uniform Criminal Extradition Act, that "[a]lthough [the petitioner] was arrested without a warrant, such procedure was authorized by 15 M.R.S.A. § 214. . . ." *Olson* v. *Thurston,* 393 A.2d 1320, 1321 n.2 (Me. 1978).

The defendant makes no claim to this court that he was not promptly taken before a judge or magistrate, allowed to answer the fugitive complaint against him, or otherwise deprived of the benefit of any procedures under § 214. Nor, apparently, did he raise such a claim in his challenge to extradition in the Maine courts. See *Sawyer* v. *State,* 382 A.2d 1039, 1041 (Me. 1978).[7]

We conclude that his arrest without a warrant, based on teletype information from the demanding State that an arrest warrant had been issued pursuant to a grand jury indictment and that the demanding State would extradite the defendant, and carried out in full compliance with required statutory procedures, met the requirements of § 214 of the Maine act providing for a warrantless arrest in the asylum State as a first step in extradition proceedings.[8]

Although the defendant concedes that the Portland police had probable cause to arrest, he also argues that, upon receiving the information from the New York authorities, the police had the time, opportunity, and resources to seek an arrest warrant from a magistrate in Maine. Thus, he claims the warrant was necessary. The defendant relies on *Payton* v. *New York,* 445 U.S. 573 (1980), which held that, absent

---

[7] In that proceeding, pursuant to tit. 15, § 210, the defendant averred that he was not in New York at the time of the offenses charged there, and that the affidavit accompanying the requisition of the Governor of New York was legally insufficient to support his arrest and extradition. Both claims were rejected. *Sawyer* v. *State, supra* at 1040-1041. The court held that the New York affidavit was not fatally defective in establishing probable cause to believe that the defendant committed the charged offenses: "As a matter of construction of our section 203, a copy of the indictment, when based on a grand jury's determination of probable cause, is all that is required" (footnote omitted). *Id.* at 1042. See *Gerstein* v. *Pugh,* 420 U.S. 103, 117 n.19 (1975); *Ierardi* v. *Gunter,* 528 F.2d 929, 930-931 (1st Cir. 1976), quoted with approval in *Olson* v. *Thurston, supra* at 1324-1325.

[8] We note too that the Maine Supreme Judicial Court's upholding of the rendition warrant, in this case, effectively foreclosed the issue of the warrantless arrest. See *Olson* v. *Thurston, supra* at 1328 ("Once a valid rendition warrant has been issued and executed, questions relating to the illegality of petitioner's prior detention are rendered moot"). See also *Brown, petitioner,* 370 Mass. 267, 269-271 (1976).

exigent circumstances, a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest violates the Fourth Amendment to the United States Constitution. Citing our decision in *Commonwealth* v. *Bradshaw*, 385 Mass. 244 (1982), the defendant urges that, in the case of his arrest, no such exigent circumstances existed. We need not consider whether the factual circumstances of the defendant's arrest were "exigent," as the arrest itself was not warrantless within the meaning of *Payton* v. *New York, supra.* Present in the instant case, and crucially absent in *Payton,* was the interposition of a grand jury's "determination of probable cause between the zealous officer and the citizen." *Id.* at 602.[9] This was conclusive in Maine on the issue of probable cause. See *Gerstein* v. *Pugh,* 420 U.S. 103 (1975); *Sawyer* v. *State,* 382 A.2d 1039, 1043 (Me. 1978) ("Under New York law the grand jury, by returning an indictment, has found probable cause. N.Y.Crim. Proc. Law § 190.65 [McKinney 1971]; e.g., *Friess* v. *Morgenthau,* 86 Misc.2d 852 . . . [Sup. Ct. 1975]").[10]

On appeal the defendant has not argued, as he did at trial, that the searches conducted after his arrest were carried out without search warrants and without probable

[9] For the same reason, *United States* v. *Jeffers,* 342 U.S. 48 (1951), and *United States* v. *Taylor,* 683 F.2d 18 (1st Cir), cert. denied, 459 U.S. 945 (1982), also relied upon by the defendant, are inapposite.

[10] We are mindful that, once the Governor of the asylum State had acted on a requisition for extradition based upon the demanding State's judicial determination of probable cause, an independent judicial inquiry in the asylum State on the issue would be prohibited by art. 4, § 2, of the United States Constitution. *Michigan* v. *Doran,* 439 U.S. 282, 290 (1978). See *Olson* v. *Thurston,* 393 A.2d 1320, 1328 (Me. 1978) ("considerations of comity and efficiency in interstate rendition proceedings alone would make it unwise for courts of asylum states to sit in judgment on the criminal procedures employed and judicial determinations made by tribunals in sister states. The Fourth Amendment does not require a second, independent probable cause determination by the asylum state, after a judicial officer in another state has already made a finding of probable cause to support an arrest warrant" [footnotes omitted]). Cf. *Whiteley* v. *Warden,* 401 U.S. 560 (1971). See 1 W.R. LaFave, Search and Seizure § 3.5 (1978).

cause. That issue, therefore, is deemed waived. Mass. R.
A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Com-
monwealth* v. *Cundriff,* 382 Mass. 137, 150-151 n.22
(1980), cert. denied, 451 U.S. 973 (1981). However we
have reviewed the entire case on the law and the evidence,
and we conclude that the admission by the judge of evi-
dence seized in the searches by the Portland police did not
create a substantial risk of a miscarriage of justice warrant-
ing an exercise of our power to grant a new trial. · G. L.
c. 278, § 33E. We are of the opinion that, even if all the
evidence seized by the Portland police had been suppressed,
the Commonwealth produced ample independent evidence
on the same material issues to support the jury's verdict.

2. *Admission of evidence relating to the defendant's
prior misconduct.* The defendant argues that the admis-
sion, over his objections, of testimony that he broke into a
house in Maine because he needed money, that he gave San-
gillo money to purchase marihuana, that he first met Ewing
in a correctional school for boys and also was incarcerated
with Kunz and Faucheux, and that he was arrested in
Maine, had a cumulatively ·prejudicial impact on the jury
which was not offset by the judge's instructions.[11] While
we have often repeated that, ordinarily, evidence of other
crimes or prior misconduct of the defendant may not be re-
ceived, *Commonwealth* v. *Clifford,* 374 Mass. 293, 298
(1978), and cases cited, such evidence, if not offered to
prove bad character or a disposition to commit a crime, may
be admitted if relevant for another purpose. See *Common-
wealth* v. *Bradshaw,* 385 Mass. 244, 269 (1982). In this
case the evidence of prior misconduct was relevant for other
purposes and the judge's cautionary instructions were suffi-
cient to prevent error prejudicial to the defendant. The evi-
dence that the defendant had burglarized a house in Maine
was introduced to establish that the defendant had little

---

[11] Evidence of the defendant's attempted escape from custody and the
admission of statements he made to the police, also admitted over the
defendant's objections, are treated in parts 3 and 4, *infra.*

money when he arrived in Maine. The judge allowed the evidence and gave a limiting instruction.[12]

The Commonwealth's evidence showed that the defendant had given Sangillo $140 or $150 to purchase marihuana after the defendant's return from New Jersey, and established that he had a substantial amount of money at that point. Immediately after Sangillo's testimony on this point, the judge again gave the jury a limiting instruction.[13] The evidence of the defendant's financial situation before and after the murder was relevant to prove that the defendant killed Faucheux for money, and on that basis its admission was within the judge's discretion. *Commonwealth v. Bradshaw, supra.* See *Commonwealth v. Brown,* 376 Mass. 156, 164-165 (1978). See also *Commonwealth v. Soroko,* 353 Mass. 254, 261 (1967); *Commonwealth v. Johnson,* 352 Mass. 311, 320-321 (1967), cert. dismissed, 390 U.S. 511 (1968). The judge's prompt limiting instructions gave ample protection to the defendant. See *Commonwealth v. Haywood,* 377 Mass. 755, 764-765 (1979).

Similarly, Ewing's testimony that he had met the defendant in 1961 while they were in a reformatory for boys and again in 1962 while they were in a men's reformatory, was offered to show the background and development of their relationship. During the presentation of this evidence the judge gave three instructions to the jury, cautioning them "not to consider [the evidence] for the purpose of painting the defendant as a bad man — but solely for the purpose of showing, if you believe it, the relationship between Mr. Ewing and the defendant, as an explanation as to why the

---

[12] "I have allowed this evidence to be heard by you, if you believe it, of course — that's always up to you — not for the purpose, and you are in no way to use it as evidence that the defendant has any predilection for crime, or that he's a bad man or a criminal or performs criminal acts, but only to show, insofar as it may, that when the defendant, as is alleged by the Commonwealth, arrived in Portland, that he had little or no money."

[13] "[T]he purpose legally for the introduction of this evidence is in no way to show that [the defendant] was a drug user or anything like that. It's only to show the money aspect that he had, in this witness' testimony, anyway, that he had a large amount of money."

defendant would have asked Mr. Ewing to do the things that Mr. Ewing alleges he did ask him to do." This evidence of the former relationship, which the Commonwealth describes as "critical . . . in order for the jury to believe Ewing's testimony that the defendant confided in him in burying Faucheux's body," was properly admitted by the judge. See *Commonwealth* v. *Haywood, supra* at 764. Cf. *Commonwealth* v. *Pickles,* 364 Mass. 395, 400 (1973); *Commonwealth* v. *Redmond,* 357 Mass. 333, 338 (1970). The judge's repeated limiting instructions cannot be assumed to have been slighted by the jury. See *Commonwealth* v. *Jackson,* 384 Mass. 572, 579 (1981).[14]

Finally, the defendant claims that the judge erred by denying a motion for a mistrial after a Maine State trooper, while reading from a written report of his New York interview with the defendant, stated, "When asked where [the defendant] got [Faucheux's] nine millimeter pistol that he had when he was arrested." The report had been previously edited by the judge, in the presence of both counsel, to delete any reference to the defendant's incarceration in New York on a conviction of murder. In denying the defendant's motion for a mistrial, the judge observed, "I think it's obvious to a jury that they were arresting him for something. What we wanted to keep out was that they were arresting him for a murder, a similar crime. I don't think that, if there's any harm in it, that it's overwhelming." The defendant now contends that the judge's failure to give a promised instruction on the trooper's inadvertent testimony was the "most prejudicial aspect" of evidence admitted of the defendant's prior acts of misconduct. However, defense counsel did not request an instruction or move to strike the

---

[14] Paul Kunz also testified, without objection, that he had been incarcerated with the defendant and the victim in New Hampshire in 1966. On cross-examination, defense counsel explored the prior incarceration of Kunz and the defendant. Defense counsel apparently elected to elicit this testimony to strengthen the credibility of the defendant's testimony that he had come to Maine to participate in burglaries planned by Kunz and Faucheux.

testimony. Thus, the defendant must show that failure to give this instruction created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. We do not believe that any such likelihood exists. See *Commonwealth* v. *Ely*, 388 Mass. 69, 73 (1983). Nor is it shown that the judge abused his discretion in denying the motion for a mistrial. See *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982).

Furthermore, the judge instructed the jury later in the trial "that the fact that a person is or is not charged with a crime, or commits a crime in another state or anywhere else is not evidence that he commits a murder or the crime for which he is here charged." This instruction was given while the defendant was being cross-examined on whether he was "on the run" from New York authorities when arrested in Maine. Because the defendant had testified that Kunz gave him Faucheux's identification cards to use in their planned burglaries and had denied that he buried a trash bag containing some personal papers with Faucheux's body, the judge permitted the Commonwealth to show that the defendant "had a motive for establishing a new identity because he was wanted for serious crimes in New York." The judge restricted the questioning in order to prevent the jury from hearing the nature of the New York charges, and instructed the jury that they could consider evidence of his fugitive status "in order to show, if it does, that the defendant might have had a possible reason or motive for putting his own papers into the grave and/or taking an identification of the deceased." This evidence of motive, properly limited by the judge's instruction, was not rendered inadmissible "merely because such evidence would tend to prove the commission of other crimes." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372 (1978). We conclude that the evidence that the defendant sought to suppress was properly admitted and that the judge took more than adequate precautions to assure that the jury would consider the evidence on a limited basis. See *Commonwealth* v. *Haywood, supra* at 764-765.

*3. Evidence of the defendant's attempted escape from custody.* At trial, the Commonwealth offered evidence that the defendant had attempted to escape from the Charles Street jail, shortly before the trial was to begin. The judge admitted the evidence on the basis that it tended to show the defendant's consciousness of guilt of the charged offense, and, during his charge, the judge instructed the jury on consideration of evidence of consciousness of guilt.[15] The defendant concedes that flight of one accused of a crime is admissible as evidence of consciousness of guilt. See *Commonwealth* v. *Haney,* 358 Mass. 304, 306 (1970); 2 J. Wigmore, Evidence § 276 (rev. Chadbourn ed. 1979). The defendant argues, however, that the evidence was not relevant or material, had no probative force with respect to the crime charged, and was highly prejudicial. He contends that it was "at least as likely that his attempted escape was motivated by his despair at having been convicted to a life sentence [in New York for murder], and by his opportunity to escape from incarceration as that he had committed the murder in the instant case."

Whether evidence is relevant to prove an issue raised by the pleadings or an incidental material issue and whether the inflammatory nature of the evidence outweighs its probative value are matters for the discretion of the trial judge. This court will accept a trial judge's conclusion except in the case of palpable error. *Commonwealth* v. *Booker,* 386

---

[15] Without waiving his objection to the admission of evidence of the attempted escape, the defendant agreed to a stipulation to be read to the jury. In addition, a hacksaw and a piece of paper seized during the attempt were admitted.

The judge instructed, sua sponte: "[A]n attempted escape, an attempted avoidance of trial may be used to, or may be considered as, consciousness of guilt. . . . I want to caution you, however, that you should never, never convict a person on evidence of consciousness of guilt alone. The reason is that there are too many other reasonable explanations as to why a person acts as he does other than showing it's a guilty conscience that motivates him. You may, however, use evidence of consciousness of guilt if you consider it such in [conjunction] with other evidence in order to determine for yourselves whether you are convinced that he is guilty beyond a reasonable doubt."

Mass. 466, 469-470 (1982), and cases cited. In the instant case, the attempted escape occurred shortly before this trial was scheduled to begin. There was evidence that when the defendant was apprehended during the attempt, a piece of paper was found in his possession. On this paper were the name, address, telephone number, and date of birth of Thomas Ewing, the Commonwealth's chief witness. Ewing was the only witness to testify that the defendant said that Faucheux had been murdered in Boston, and thus Ewing was the primary evidentiary link between the crime and the Commonwealth.

The judge could therefore conclude that this evidence was relevant to show consciousness of guilt of the crime charged.[16] *Commonwealth* v. *Booker, supra* at 470. Evidence is not inadmissible merely because it tends to show the commission of another crime. *Commonwealth* v. *Roberts,* 378 Mass. 116, 125-126 (1979). *Commonwealth* v. *Gilday,* 367 Mass. 474, 496 (1975). The judge ruled that if the defendant took the stand, the Commonwealth would not be permitted to introduce his conviction for murder in New York for the purpose of impeachment. "Although the evidence explaining a possible motive for the defendant's flight, other than consciousness of guilt of the crime charged in the instant case, [might tend] possibly to prejudice the

---

[16] Because there was evidence, in the form of the proximity of the attempted escape to the time of trial, and the presence of Ewing's name and address on the defendant's person, from which the judge found the attempted escape to be probative of the offense being tried, the defendant's analogy to *United States* v. *Myers,* 550 F.2d 1036 (5th Cir. 1977), aff'd after remand, 572 F.2d 506 (5th Cir.), cert. denied, 439 U.S. 847 (1978), and to decisions from other jurisdictions, is unavailing. Cf. *Commonwealth* v. *Booker,* 386 Mass. 466, 471 (1982).

The defendant points out our discussion in *Commonwealth* v. *Toney,* 385 Mass. 575, 584-585 (1982), citing *Miller* v. *United States,* 320 F.2d 767 (D.C. Cir. 1963) (separate opinion by Bazelon, C.J.), of the inference of guilt that may be drawn from evidence of flight, concealment, or similar acts. In this case, having ruled the evidence of the defendant's attempted escape to be admissible, the judge appropriately instructed the jury on consideration of this evidence. See *Commonwealth* v. *Toney, supra* at 585.

defendant by showing that he was involved in other criminal activity, this factor does not render the flight evidence inadmissible." *Commonwealth* v. *Booker, supra* at 471. See generally *Commonwealth* v. *Toney,* 385 Mass. 575, 582-584 (1982). We conclude there was no error.

4. *Voluntariness of the statements to the police.* The defendant argues that the judge's failure to instruct the jury under our "humane practice" rule on the voluntariness of the defendant's statements, made in New York to a Maine State trooper, requires reversal. See *Commonwealth* v. *Cole,* 380 Mass. 30, 38-43 (1980). In the alternative, the defendant urges that this failure amounted to grave prejudice or substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Roberts,* 378 Mass. 116, 122-123 (1979). We do not agree.

In accordance with our humane practice rule the judge conducted a voir dire prior to admitting the testimony of the Maine State trooper. At the voir dire the trooper testified that he had informed the defendant of the Miranda warnings and had asked whether he understood them prior to beginning the interview. The defendant did not appear confused, under the influence of alcohol, or tired. After an interview of about one-half hour, the trooper advised the defendant that, on the basis of an ongoing investigation, he would be charged with Faucheux's murder. The defendant then stated that he did not wish to make any further statements, and the interview ended. The defendant testified that, prior to questioning, the trooper read him the Miranda warnings and told him what would be discussed, after which the defendant stated that he wanted a lawyer present if he was to be charged with anything. On cross-examination the Commonwealth asked the defendant if he had been tricked by the trooper into making his statements. The defendant answered, "I don't know if I'd say he tricked me."

The judge found that the defendant understood and voluntarily waived his Miranda rights and voluntarily made his statements to the trooper and that the defendant had

never said that he wanted a lawyer if he was going to be charged. The judge characterized the defendant's statements as admissions, and indicated at that time that he would submit the question of voluntariness to the jury. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 150 (1982). In his charge, the judge omitted the instruction. The defendant concedes that he neither requested an instruction nor objected to its omission, but argues that he relied on the judge's promise and that he was prevented by the judge from testifying to the circumstances of the interview.[17] We need not consider the latter argument, as we conclude that voluntariness was never made a live issue by the defendant, and the judge had no duty to instruct the jury to pass upon the question.[18] *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978). "There was no evidence whatsoever raising an issue of coercion or duress." *Commonwealth* v. *Williams*,

---

[17] At the conclusion of the voir dire, the judge told the defendant: "I have in mind that I am doing everything possible to protect the record of the jury from hearing where this interview took place. Have in mind that — if you decide to take the stand before the jury, have in mind that if you deny this statement or the circumstances under which it was made, you may force me to open up to the jury where it was taken and under what circumstances. And I do not do this in order to in any way chill your right to take the stand in your own behalf on other facets of the case." The judge spoke also to defense counsel: "If he takes the stand, as to anything else he is into, if he were to deny the voluntariness of this statement, other than deny it ever happened, if he were to talk about whatever happened that morning, he is apt to open up where it took place."

[18] At the voir dire, the sole issue raised by the defendant w⌐s whether he had asked that a lawyer be present if he were to be charged with a crime. See *Commonwealth* v. *Richmond*, 379 Mass. 557, 560-561 (1980). The judge's finding of a voluntary waiver is "entitled to substantial deference by this court," *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd by an equally divided Court, 439 U.S. 280 (1978), and "his resolution of conflicting testimony will be accepted." *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). Considering the matter in the light of "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation," *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975), quoting from *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973), we agree with the judge's conclusion that the defendant's waiver was knowing, intelligent, and voluntary. See *Commonwealth* v. *Maltais*, 387 Mass. 79, 89 (1982).

378 Mass. 217, 227 (1979). The judge had no duty to instruct the jury on voluntariness. Cf. *Commonwealth* v. *Cole,* 380 Mass. 30, 40 (1980). Nor can we view the admission of the statements as gravely prejudicial or creating a substantial risk of a miscarriage of justice. Paul Kunz testified that the defendant told him the same version testified to by the State trooper. Since essentially the same testimony was received from another witness, we find no prejudice to the defendant in admitting the statements.

5. *Relief under G. L. c. 278, § 33E.* The defendant asks that we exercise our powers under G. L. c. 278, § 33E, to grant him a new trial or other appropriate relief. He claims that the cumulative effect of the errors he has assigned and the strength of the evidence against him render the verdict inconsonant with justice. See e.g., *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977). The defendant argues that he refuted convincingly the Commonwealth's case against him. But it was for the jury to assess the credibility of the witnesses and weigh the evidence. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 377 (1978). In exercising our powers under G. L. c. 278, § 33E, we do not act as a second jury. *Commonwealth* v. *Parker, ante* 27, 32 (1983). *Commonwealth* v. *Prendergast,* 385 Mass. 625, 638 (1982). We find on this record no mitigating circumstances warranting the exercise of these powers. See *Commonwealth* v. *Cartagena,* 386 Mass. 285, 290 (1982).

*Judgment affirmed.*