RICHARD S. ROBIE & another vs. MASSACHUSETTS
TURNPIKE AUTHORITY & others.

Suffolk.    May 7, 1964. — June 29, 1964.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Massachusetts Turnpike Authority.  Way,* Public: approval of location,
Massachusetts Turnpike, incidental easement. *Eminent Domain,* Secu-
rity for damages, Validity of taking, Purpose of taking. *Department
of Public Works. Public Board. Public Officer. Constitutional Law,*
Eminent domain. *Evidence,* Presumptions and burden of proof. *Words,*
"Abutting."

Plans showing the approximate center line of a portion of the Massachu-
setts Turnpike, the existing ways and utilities crossed, and the points of
proposed interchanges, but not showing the several areas to be taken,
sufficiently indicated the "location" of such portion of the turnpike for
the purposes of the approval thereof by the State Department of Pub-
lic Works required by St. 1952, c. 354, § 1.    [721]
The provisions of St. 1952, c. 354, § 5 (k) ; G. L. c. 79, § 40, relative to
the furnishing by the Massachusetts Turnpike Authority to the State
Treasurer of security for payment of land damages for property taken
by the Authority do not require the furnishing of security specifically
referable to the damages sustained by each landowner, as distinguished
from blanket security respecting all damages.    [723]
A landowner was not entitled to attack the validity of a taking of his
land by the Massachusetts Turnpike Authority under St. 1952, c. 354,
§ 5 (k), on the ground of noncompliance with the requirement of the
statute as to furnishing security for the payment of land damages,
where he had not availed himself of the remedy respecting such security
afforded him by G. L. c. 79, § 40.    [723–724]
The provision of G. L. c. 16, § 2, as amended through St. 1956, c. 717,
for a Department of Public Works consisting of a commissioner and
two associate commissioners did not have the effect of requiring partici-
pation by all three in taking official action; a majority of them was
sufficient under G. L. c. 4, § 6, Fifth.    [724]
One attacking the validity of action of the State Department of Public
Works shown by its record to have been taken at a meeting of the com-
missioners at which two of the three commissioners were present had
the burden of proving that the third commissioner had no notice of the
meeting or was deprived of an opportunity to attend.    [725]
A taking by the Massachusetts Turnpike Authority of land abutting its
turnpike in order to grant an easement to a railroad over the land for
the purpose of relocating a yard of the railroad was within the powers
of the Authority under St. 1952, c. 354, § 7, as amended by St. 1958,

c. 384, § 3, and was not invalid in that it was made pursuant to a previously executed contract between the Authority and the railroad whereby the railroad agreed to sell to the Authority the land on which the yard had been located and other land and the Authority agreed to make the taking and to grant the easement for the relocation. [727–728]

The provisions of St. 1952, c. 354, § 7, as amended by St. 1958, c. 384, § 3, authorizing the Massachusetts Turnpike Authority to take land abutting its turnpike for the purpose of removing or relocating public utility facilities and to lease the land or convey an easement or other interest to the utility, are constitutional. [728]

Where one of three contiguous parcels of land of the same landowner was a strip abutting an interchange of the Massachusetts Turnpike, all the land could properly be found to be "abutting the turnpike" as required for a taking of the land by the Massachusetts Turnpike Authority under St. 1952, c. 354, § 7, as amended by St. 1958, c. 384, § 3. [726–727, 729]

BILL IN EQUITY filed in the Superior Court on February 20, 1963.

The suit was heard by *Lappin, J.*

*Edward C. Park (Charles C. Worth* with him) for the plaintiffs.

*James W. Kelleher (Arthur E. Sutherland* with him) for the defendants.

WILKINS, C.J.   The plaintiffs were the owners of three parcels of land in Boston which were taken by the defendant Massachusetts Turnpike Authority by eminent domain. Other defendants are the Commissioners of Public Works, New York Central Railroad Company, New England Merchants National Bank and another, trustees, and City Bank & Trust Company.   This bill for declaratory relief under G. L. c. 231A also contains a prayer that the taking be adjudicated invalid.   A final decree was entered declaring that the order of taking was valid, and that title to the parcels vested in the Authority on November 13, 1962.   The plaintiffs appealed.   The judge filed a statement of findings, from which the facts herein stated are taken.   The evidence is reported.

The order of taking, dated October 18, 1962, and registered in the Land Court, Suffolk County Registry District, on November 13, 1962, recited that it was "For the purpose of constructing, maintaining, repairing and oper-

ating, as an express toll highway, in accordance with the location approved by the state department of public works on April 12, 1960, a road in the City of Boston, County of Suffolk, known as the 'Boston Extension' of the Massachusetts Turnpike, for the purpose of relocating public utilities, including rail lines, in connection therewith, for the purpose of relocating a portion of a public way (Cambridge Street), for the purpose of constructing a connecting road to either a public or private way (sometimes referred to as Dedham Parish Road) to be relocated, and for the purpose of performing other related work deemed necessary in connection therewith . . . ."

The plaintiffs' three parcels have a total area of 727,800 square feet and are shown on the taking plan. Parcel B33–3 contains 724,049 square feet, and is bounded by Western Avenue and Soldiers Field Road. Parcel B33–C9 contains 1,082 square feet, and is located at the southwest corner of Parcel B33–3. Parcel B33–4 contains 2,669 square feet, and is a strip twenty feet wide running northerly from Cambridge Street to Parcel B33–C9.

APPROVAL BY DEPARTMENT OF PUBLIC WORKS.

The plaintiffs contend that "there had been no location of the turnpike extension approved by the Department" of Public Works, and, hence, that there was no compliance with St. 1952, c. 354, § 1 (as amended through St. 1955, c. 47).[1] Such compliance, they argue, was a condition precedent to the validity of the taking. This we assume for the purposes of this case, but without so deciding. Compare *Lajoie* v. *Lowell*, 214 Mass. 8, 9.

On December 18, 1958, the Authority requested the department to approve the location of the Boston Extension as shown on a set of plans consisting of thirteen sheets.

[1] "The Massachusetts Turnpike Authority (hereinafter created) is hereby authorized and empowered, subject to the provisions of this act, to construct, maintain, repair and operate at such location as may be approved by the state department of public works a toll express highway, to be known as the 'Massachusetts Turnpike', from a point in the vicinity of the city of Boston or from a point or points within said city to a point at or near the boundary line between the Commonwealth and the State of New York or such part or parts thereof as it may determine . . . ."

By letter dated December 31, 1958, the department replied that the commissioners had voted to approve, and had so indorsed, the plans. On March 31, 1960, the Authority requested a similar approval in accordance with another set of plans consisting of thirteen sheets which showed certain variations of the location made since the earlier request and approval. By letter dated April 12, 1960, the department again informed the Authority that the commissioners had approved the changes and had so indorsed the plans.

Neither set of plans showed the names of owners of land "included in the location of the center line" of the turnpike or in the "area abutting the location of the center line." Each set of thirteen sheets showed the course of the turn-pike from Weston to Boston. They all showed the various streets, highways, and utilities which the center line crossed and "diagrammetric" representation of ramp and interchange locations. Sheet No. 9, covering the area where the plaintiffs' land is, showed the location of the turnpike as it crossed the area of Cambridge and Windom streets and Soldiers Field Road, as well as the diagram of a ramp to connect the turnpike with Cambridge Street.

The letters of December 18, 1958, and March 31, 1960, contained the following: ". . . The Authority has now determined to construct the remainder of the Massachusetts Turnpike, as authorized, to be known as the Turnpike Extension, extending from the initial Turnpike in the Town of Weston through parts of the City of Newton, the Town of Brookline and the City of Boston to Kneeland Street and the John F. Fitzgerald Expressway in said City of Boston, substantially along or adjacent to the main line of the Boston & Albany Railroad. The location is shown on the attached set of plans, in duplicate, by its approximate center line of construction, plus 'diagrammetric' representation of ramp and interchange locations."

The judge ruled, and we think correctly, that the intent of St. 1952, c. 354, § 1, is "to place a safeguard in the hands of that department of our state government best equipped with the knowledge of roadbuilding, safety engineering,

existing highways and traffic patterns, to guarantee that the proposed location of the turnpike would not unduly interfere with our existing highway system or create unnecessary traffic or safety problems for those using our highways.''

The judge further ruled that there was no evidence presented by the plaintiffs to support their contention that the proposed location approved by the department on April 12, 1960, was not sufficiently definitive to be determined a ''location'' within § 1; and that the approval was valid and satisfied the requirement of § 1.

The plaintiffs insist that a ''location'' must have more than one dimension. They rely upon certain old cases relating to railroad locations, for which, however, the statutory procedure was quite different from that for planning the course of highways, as well as from that provided in St. 1952, c. 354. The old highway procedure is described in *Commonwealth* v. *Coombs,* 2 Mass. 489. When a highway from town to town or place to place in the same town (*Commonwealth* v. *Cambridge,* 7 Mass. 158, 161) was sought, application was to be made to the Court of Sessions to locate and establish it. ''The petition should state the two *termini* of the way prayed for, and its general direction, that the court may be able to decide whether it will be of common convenience or necessity'' (p. 490). The town was entitled to notice and a hearing. At this stage it was not ''necessary, for two reasons, that the owners of the land, over which the way may pass, should be made parties. One reason is, that the owner is not, in legal contemplation, an adverse party in interest, because the statute provides that he shall be satisfied for all damages he may sustain in his property by the location. The other reason is, that it cannot now be known who will be the owners of the land over which the way may be laid out. The general direction only of the road is known, but the specified land to be encumbered by it cannot be ascertained but by the locating committee. . . . If the way be adjudged of common convenience or necessity, a warrant is then to issue . . . directed

to five disinterested sufficient freeholders of the county, to locate the way and to estimate the damages any person may sustain in his property by the location . . ." (pp. 490–491). The committee gave notice to all interested persons including "all the owners of the land, who may be affected by ascertaining the course and situation of the road" (p. 491). After executing the warrant, the committee returned it to court.

In *Springfield* v. *Connecticut River R.R.* 4 Cush. 63, 69, Chief Justice Shaw referred to the distinction between railroad and highway locations in these words: "It is somewhat remarkable, that in a matter so deeply affecting private rights and interests, the precise location or line of railroad, on the ground, is not fixed by the act granting the power, nor is it provided, that it shall be fixed by any board of public officers, who may be supposed to act impartially. In laying out highways, the precise course of location is fixed by the county commissioners, formerly the court of sessions, a public body of disinterested officers, supposed to act as impartial arbitrators between the public and individual proprietors. But in railroads, the authority to the corporation is, to locate, construct and complete a railroad within certain *termini,* giving the general direction, but leaving the precise location to be determined, not by the county commissioners, but by the company. The corporation must file their location with the commissioners within one year, defining the courses, distances and boundaries, but the commissioners have no power of prescribing or altering it."

In other words, the location or line on the ground of a railroad was not a preliminary procedure to determine the general route and whether it would be in the public interest to have the road at all. That determination had already been made by the Legislature. On the other hand, in the context of the statutory prescribed railroad procedure "location" was synonymous with "laying out." The location of the road by the railroad company, when properly determined, itself constituted the taking, and no further action

was required. "The filing of the location is the act of taking the land. *Charlestown Branch Railroad* v. *County Commissioners,* 7 Met. 78. The location, when so filed, constitutes the written, permanent, record evidence of the land taken. It sets off by metes and bounds the land subjected to the servitude. It is conclusive upon the corporation and the landowner. It is the evidence, the only permanent evidence, of what the one has been permitted to take, and the other compelled to relinquish. ·Without it, the rights of either would be left in uncertainty, not only not ascertained, but not capable of being ascertained." *Hazen* v. *Boston & Maine R.R.* 2 Gray, 574, 580. See *Harding* v. *Biggs,* 172 Mass. 590.

The construction to be given to St. 1952, c. 354, § 1, we think closely resembles the views expressed in *Commonwealth* v. *Coombs,* 2 Mass. 489. The plaintiffs' argument in substance means that each individual taking by the Authority must have the approval of the Department of Public Works. Such a construction would be unreasonable and we reject it. As previously noted as to the ruling of the trial judge, the function of the department is not to protect the rights of landowners, but is to approve on the basis of how the turnpike extension would fit in with existing and proposed highways. There is no purpose evident in the statute to preclude the department's approval being made upon the basis of these plans showing existing ways, the center line of the proposed extension, the location of public utilities, and the points at which interchanges are planned. A location so approved does not in any sense constitute a taking. This would thereafter be made pursuant to G. L. c. 79.

## THE SECURITY GIVEN.

The plaintiffs next contend that the taking was invalid because the Authority failed to give security in amount and form determined by the Department of Public Works for the payment of damages for such taking. Section 5 (k) of St. 1952, c. 354, contains the condition: "and provided, further, that the Authority shall give security to the state

treasurer, in such amount and in such form as may be determined by the state department of public works, for the payment of such damages as may be awarded in accordance with law for such taking, and that the provisions of section forty of said chapter seventy-nine [of the General Laws], in so far as the same may be applicable, shall govern the rights of the Authority and of any person whose property shall be so taken.''

Section 40 of c. 79, provides: ''Before a taking is made or injury inflicted by a private corporation for which damages may be recovered under this chapter, such corporation shall give to the board of officers by whom such damages are to be awarded security to their satisfaction for the payment of all damages and costs which may be awarded by them or by the court for the land or other property taken or injured; and if, upon petition of the owner and notice to the adverse party, any security taken appears to them to have become insufficient, they shall require the corporation to give further security to their satisfaction. If the corporation fails to comply with this section any person entitled to such damages may treat the taking of his property or the proceedings by which the right to inflict injury thereon was acquired as void and any interference by such corporation with the use and enjoyment of his property as unlawful.''

On February 8, 1962, the Authority executed an agreement with The First National Bank of Boston, trustee, and the State Treasurer, whereby the Right of Way Division of the Authority certified that the estimated value of the property to be taken for the Boston Extension would not exceed $22,750,000, and agreed to file a penal bond in this amount with a deposit of cash or United States bonds. On February 12 the right of way engineer of the Department of Public Works reported on this agreement and stated his belief that the amount and form were adequate and complied with § 5 (k). The record of the meeting on that date recites, ''A meeting of the Commissioners was held today, Commissioner Ricciardi and Associate Commissioner Toumpouras being present''; and that it was voted that the

amount of security "be determined as adequate and in conformance with" § 5 (k). On March 22, 1962, the Authority executed the bond for $22,750,000, and on March 26 forwarded it to the State Treasurer.

The contract of February 8, 1962, shows at the end the following statement, "The undersigned has, by vote of its members, determined that the form and amount of security hereinabove provided for is adequate and conforms to the requirements of Section 5 (k) of Chapter 354, Acts of 1952." The statement, which we interpret as referring to the vote of February 12, was signed in the name of the Department of Public Works by the two commissioners who were mentioned in the record of the meeting of February 12.

(a) The first objection of the plaintiffs is that no specific security was given by the Authority for a specific property owner, and hence the department did not approve the security for the payment of damages to each landowner. A main weakness in this objection is that no statute or rule of law makes this requirement. The case of *Connecticut River R.R.* v. *County Commrs. of Franklin,* 127 Mass. 50, is not an authority for the plaintiffs. The vice of the statute there held unconstitutional was that the only mode of compensation for the land taken for a passenger station of a railroad owned by the Commonwealth was restricted to the earnings of the railroad. In the case at bar there is no limitation restricting the payment of damages to the earnings of the turnpike extension.

Another fatal flaw is that the plaintiffs did not follow the procedure prescribed in c. 79, § 40. This case in this respect is governed by *McCarthy* v. *Woburn Housing Authy.* 341 Mass. 539, 541–543, in which we held that a petition by the owner was an exclusive statutory remedy where "a person whose land has been taken has any doubts about the nature and extent of the security." Contrary to the plaintiffs' contention, the scope of that decision was not confined to a case where the security given is attacked as inadequate. Any other construction would lead to an absurd and un-

reasonable conclusion which would permit a landowner to withhold his complaint and, then relying upon an easily curable defect, to retake his land with improvements. See the decision of a three judge court, *Ahoyian* v. *Massachusetts Turnpike Authy.* 211 F. Supp. 668 (D. Mass.), affd. 371 U. S. 186.

(b) A second objection of the plaintiffs is that a determination by two of the three commissioners cannot be deemed to be a determination by the department unless it appears that the third commissioner participated or at least was notified and had an opportunity to be present. The record contains no facts as to notice to the third commissioner or as to his opportunity to be present. The question is not mentioned or discussed in the extensive findings of the trial judge. Whether the subject was raised before him we have no way of knowing. The brief of the defendants ignores the issue.

The plaintiffs contend that by statute participation by all three commissioners was required. The mere statement in G. L. c. 16, § 2 (as amended through St. 1956, c. 717),[1] that the department consists of "a commissioner of public works and two associate commissioners," did not have this effect. General Laws (Ter. Ed.) c. 4, § 6, Fifth, reads, "Words purporting to give a joint authority to, or to direct any act by, three or more public officers or other persons shall be construed as giving such authority to, or directing such act by, a majority of such officers or persons." As was said in *Real Properties, Inc.* v. *Board of Appeal of Boston,* 311 Mass. 430, 434, "This means that such officers or persons 'should act jointly, and that all should have an opportunity to participate in their action,' at least in the absence of extraordinary circumstances . . . but when all have had such an opportunity the officers or persons may act by majority."

Nothing in G. L. c. 30, § 6 or § 10, affects this matter. No absence or disability was shown and no vacancy existed.

[1] A subsequent amendment was not in effect.

As the case comes to us, there is nothing to show that the meeting was other than in the regular course of business of the department or that the third commissioner did not know of it or was deprived of an opportunity to attend. We are loath to accept any theory whereby the burden of proving the missing facts is thrust upon the defendants. To do so would be contrary to the usual rule that "[t]here is a presumption that the acts of public bodies are regular and lawful." *Openshaw* v. *Fall River,* 287 Mass. 426, 432, and cases cited. *Coleman* v. *Louison,* 296 Mass. 210, 214. *Taylor* v. *United States,* 324 Mass. 639, 647, cert. den. 338 U. S. 948. *James Constr. Co. Inc.* v. *Commissioner of Pub. Health,* 336 Mass. 143, 146. *Cushing* v. *Fire Commr. of Brookline,* 345 Mass. 418, 422. See *McCarthy* v. *Commonwealth,* 204 Mass. 482, 485. The rule was well stated by Chief Justice Shaw in *Sargent* v. *Webster,* 13 Met. 497, a case relating to a manufacturing corporation where it was contended that it did not appear that notice of a directors' meeting was given to all the directors. "But the contrary does not appear; and it would be hazardous to decide that every vote, passed by an aggregate body, is void, if it do not appear by the record that all were notified. We believe it is not usual, in corporate records, to state how the members were notified. The presumption, '*omnia rite acta,*' covers multitudes of defects in such cases, and throws the burden upon those, who would deny the regularity of a meeting, for want of due notice, to establish it by proof" (page 504).

### THE EASEMENT TO NEW YORK CENTRAL RAILROAD COMPANY.

The plaintiffs charge that "the taking was invalid because required, not for the purposes of the Act constituting the Authority, but to enable the Authority to perform an illegal contract with the New York Central Railroad."

On December 31, 1958, the Authority made a contract with the Boston and Albany Railroad Company and the New York Central Railroad Company (1) whereby the railroad companies agreed to sell to the Authority certain land.

part of which was the Beacon Park yards south of Cambridge Street and Taking B33 (which included the plaintiffs' land); and (2) whereby the Authority agreed (a) to acquire by eminent domain, among other land, the locus involved in this litigation (which was then owned by the Metropolitan District Commission and at the time of the taking was owned by the plaintiffs) and (b) to grant the railroads an easement over such lands for the purpose of relocating the Beacon Park yards. This contract was amended and incorporated in a new similar agreement dated February 7, 1962, between the Authority and New York Central Railroad, which had succeeded to all rights and obligations of Boston and Albany Railroad. In December, 1962, the Authority and New York Central Railroad exchanged deeds to carry out the agreements. The contemplated easement over the plaintiffs' land was revised so as to provide a setback of approximately 200 feet in depth for the length of the boundary on Western Avenue.

The trial judge stated that there was conflicting testimony as to the reason for the setback, a matter which need not be resolved, because he was not plainly wrong in finding that all the plaintiffs' land was taken "for purposes of the Turnpike Act" and that no part of it was taken with the intention at the time of disposing of any part of it to any person other than for the easement to the New York Central Railroad. He ruled that the granting of the easement was a valid exercise of the power given to the Authority by St. 1952, c. 354, § 7, as amended by St. 1958, c. 384, and cited Luke v. Massachusetts Turnpike Authy. 337 Mass. 304.

The trial judge earlier in his findings and rulings had stated: "The court does not agree with the plaintiffs' contention that their land does not abut the Turnpike and therefore cannot be validly taken under the provisions of Section 7 of Chapter 354 of the Acts of 1952, as amended by Section 3 of Chapter 384 of the Acts of 1958 which states in part '. . . The Authority shall have the power, in the process of constructing or reconstructing all or any part of the Turnpike or any extension thereof or additions thereto, to take by eminent domain pursuant to chapter 79 of the Gen-

eral Laws, such land abutting the Turnpike as it may deem necessary or desirable for the purposes of removing or relocating all or any part of the facilities of any public utility, including rail lines. . . .' The court took a view of the area and I find that Parcel B33–4 of the plaintiffs' land is a strip that abuts Cambridge Street and that Parcel B33–4 is contiguous to Parcel B33–C9 which in turn is contiguous to the remaining parcel of the plaintiffs' land parcel B33–3. I find that there is an interchange of the Turnpike being constructed on Cambridge Street and I rule that an interchange is part of the Turnpike as defined by the Turnpike Act itself (see *Opinion of the Justices,* 330 Mass. 713). I therefore rule that the plaintiffs' land does abut the Turnpike within the meaning of Section 7 of the Act as amended.''

Notwithstanding the findings, the plaintiffs seek to found a case upon the order of events and to rely upon the undoubted, well settled principle of law that the power of eminent domain cannot be contracted or bartered away. See *Flower* v. *Billerica,* 324 Mass. 519, 522; *Burnes* v. *Metropolitan Dist. Commn.* 325 Mass. 731, 734. Such a conclusion cannot be predicated upon the language of the contract and upon the mere fact that it was executed before the actual taking. There is no absolute rule of law invalidating a contract executed in contemplation of a taking and substantially as part of the same transaction. This result would be contrary to rational business judgment. If a taking is definitely to be made by eminent domain, the exercise of the taking authority's power does not become unlawful because a reasonable business precaution is first taken.

Neither does the taking become invalid merely because more land was taken than was to become permanently part of the highway. See *Boston* v. *Talbot,* 206 Mass. 82, 90; *Luke* v. *Massachusetts Turnpike Authy.* 337 Mass. 304, 309–310.

In so far as an easement in part of the land taken was conveyed to the railroad, consideration is to be given to St. 1952, c. 354, § 7, as amended by St. 1958, c. 384, § 3, which provides, ''The Authority shall have power, in the process

of constructing . . . the turnpike or any extension thereof
. . . to take by eminent domain pursuant to chapter sev-
enty-nine of the General Laws, such land abutting the turn-
pike as it may deem necessary or desirable for the purposes
of removing or relocating all or any part of the facilities of
any public utility, including rail lines, and may thereafter
lease the same or convey an easement or any other interest
therein to such utility company upon such terms as it, in its
sole discretion, may determine. . . ."

The constitutionality of the quoted provision seems clear
from *Meisel Press Mfg. Co.* v. *Boston,* 272 Mass. 372, which
concerned a statute authorizing the city in taking land for
rapid transit facilities to make compensation to any rail-
roads "in whole or in part in land, bridges, structures,
materials or labor, including alterations . . . as may be
necessary and proper to put said railroad companies in as
good position as they now are for conducting their business
. . ." (page 377). At pages 381–382, it was said: "A
taking for the purpose of obtaining for the public better
rapid transit facilities is a taking for a public use and if, as
incident to such taking, the public would otherwise be de-
prived of certain railroad accommodations, the public in-
terest would justify authorizing the city to take enough
land so that such loss of railroad accommodations might not
result. This would not be the acquiring of property with
public money, to sell in whole or in part to private individ-
uals, within the meaning of the rule stated in *Opinion of the
Justices,* 261 Mass. 556, 612. The railroad company is a
corporation with public duties and with authority under
specified conditions to take property by eminent domain."

The trial judge in his ruling, quoted *supra,* that the plain-
tiffs' land abutted the turnpike, relied, in part at least, on
St. 1952, c. 354, § 4 (b).[1] On that theory, we would have

---

[1] "The word 'turnpike' shall mean the express toll highway or such part or
parts thereof as may be constructed under the provisions of this act, together
with and including all bridges, tunnels, overpasses, underpasses, interchanges,
entrance plazas, approaches, connecting highways, service stations, restaurants
and administration, storage and other buildings and facilities which the Au-
thority may deem necessary for the operation of the turnpike, together with all
property, rights, easements and interests which may be acquired by the Author-
ity for the construction or the operation of the turnpike."

great difficulty in ruling that his findings on this issue were plainly wrong. There are numerous plans in evidence, but none of them is well suited for use as the basis of this opinion. If any were so suited, we should, in the interest of clarity, cause one of them to be made a part hereof.

We are of opinion that it is enough if the land taken abuts upon the finished highway. In *Broderick* v. *Department of Mental Diseases,* 263 Mass. 124, the department by statute was given power by eminent domain to acquire land for a hospital, "provided, that no land shall be taken or purchased except such as adjoins land owned by the Commonwealth on the effective day of this act or land taken or purchased under authority hereof" (pages 126–127). The department took parcel A which adjoined land of the Commonwealth. It then took parcel B which adjoined parcel A but not land of the Commonwealth before the taking of parcel A. It then took parcel C which adjoined parcel B but not land of the Commonwealth before the taking of parcel B. It then took parcel D which adjoined parcel C but not land of the Commonwealth before the taking of parcel C. The takings were all upheld, it being said at pages 127–128, "The power given to the department was not exhausted by the first taking. The statute enacted that the land taken should adjoin land owned by the Commonwealth on the 'effective date of this act or land taken or purchased under authority hereof'; it contemplated the taking of additional land adjoining land already taken under statute; the grant of power given to the department was complied with and the takings of parcels B, C and D were valid."

We think that the *Broderick* case is a persuasive analogy to the case at bar, and that "abutting" should not require each parcel taken to be contiguous with the turnpike prior to the taking, but only to be part of a contiguous whole after the completion of the taking. Otherwise the amount of land which could be taken would depend upon the accidental circumstance of the size of the holdings of the owners touching the turnpike, and would have no relation to the needs of the project as determined by the taking authority.

*Decree affirmed.*