## COMMONWEALTH vs. REGINA LEAVITT.

Suffolk.   November 10, 1983. — March 7, 1984.

Present: BROWN, PERRETTA, & KASS, JJ.

*Contempt.  Perjury.  Grand Jury.  Practice, Criminal,* Indictment, In-
structions to jury.  *Evidence,* Relevancy and Materiality, Other offense.

A contempt indictment stating that the defendant did "intentionally, wil-
fully and knowingly impede, hinder, interfere and obstruct" a grand
jury investigating Medicaid fraud, together with a bill of particulars
alleging that the defendant's contempt consisted of destroying certain
records and failing to deliver certain others to the grand jury as re-
quired by a subpoena, adequately informed the defendant of the
charges against her.  [588-589]

A special grand jury convened during the extended term of another special
grand jury, investigating Medicaid fraud, was not precluded from in-
vestigating different cases of Medicaid fraud by the provision in G. L.
c. 277, § 1A, prohibiting a grand jury during an extended term of serv-
ice from considering new matters.  [589-590]

The fact that the record in a perjury case arising from the defendant's tes-
timony before a grand jury failed to show that the grand jurors had
taken their statutory oath did not require reversal of the defendant's
conviction.  [590-591]

At the trial of a perjury case arising from the defendant's testimony before
a grand jury investigating Medicaid fraud, there was no error in ad-
mitting evidence that the defendant's company, a provider of medical
equipment, had retained double payments or overpayments received
by it, where this evidence was relevant to show the defendant's motive
for lying before the grand jury.  [591-592]

At the trial of contempt and perjury charges arising from the defendant's
testimony before a grand jury, there was no error in the admission in
evidence of an order of a Superior Court judge refusing to quash or
modify the grand jury's subpoena to the defendant and stating that
"[t]he materials summonsed are relevant and material" to the grand
jury's investigation, where the order was relevant to the contempt
charge and where the judge gave appropriate limiting instructions to
the jury.  [592-593]

At the trial of contempt and perjury charges the judge's instructions to the
jury on the presumption of innocence contained no error.  [593-594]

At the trial of a contempt case there was reversible error in the judge's instructions to the jury defining the crime of contempt resulting from his use of the terms "misbehavior" and "inappropriate" in relation to the conduct which the Commonwealth was required to prove. [594-596]

BROWN, J., concurring, expressed views on incarceration of "white-collar" criminals. [596-597]

INDICTMENTS found and returned in the Superior Court Department on July 7, 1981.

The cases were tried before *Ronan, J.*

*Alan M. Dershowitz* for the defendant.

*Paul Cirel,* Assistant Attorney General, for the Commonwealth.

KASS, J. In the course of an investigation in 1980 of Medicaid[1] fraud, a special grand jury probed the billing practices of Hospital Equipment Services, Inc. (HES), a provider of hospital beds, wheel chairs, respiratory aids, walkers, and other durable medical equipment. Responding to a subpoena (after an unsuccessful motion to quash), Regina Leavitt, the president of HES, appeared before the grand jury on August 13, 1980, and December 1, 1980.[2] Those appearances led to the two indictments on which the defendant was convicted by a jury, convictions from which she brought this appeal. The first indictment charges that she did "intentionally, wilfully and knowingly impede, hinder, interfere and obstruct the grand jury" and, therefore, was in contempt of court; the second, that she committed perjury (G. L. c. 268, § 1).[3]

---

[1] Medicaid is a program of medical care and assistance established under the provisions of G. L. c. 118E, in compliance with Title XIX of the Social Security Act. See Pub. L. No. 89-97, 79 Stat. 343 (1965); 42 U.S.C. § 1396 (1976). See generally *Sargeant* v. *Commission of Pub. Welfare,* 383 Mass. 808 (1981).

[2] The Commonwealth says in its brief that Leavitt appeared before the grand jury on four occasions, but August 13th and December 1st are the dates upon which the indictment and a bill of particulars focus.

[3] The jury returned a third indictment for larceny, which was severed. Leavitt entered a plea of guilty on the larceny indictment on August 26, 1982, several months after the conclusion of her trial on contempt and perjury.

As alleged by the Commonwealth in a bill of particulars, and as developed at trial, Leavitt's contempt consisted of (1) not delivering, and, indeed, destroying records of patients whose accounts were no longer active, the so-called "closed ledger cards"; (2) tearing inculpatory adding machine tapes from closed patient files before turning the files over to the grand jury; and (3) the nonproduction of certain current or "open ledger cards." During the presentation of the defense case, evidence also emerged of delayed — and, hence, arguably obstructive — production of a sales adjustment journal and a cash receipts journal.

Perjury, as alleged by the Commonwealth, occurred when Leavitt, while testifying before the grand jury on two different occasions, denied the existence of all but isolated closed ledger cards at the time she was served with the grand jury's subpoena. More particularly, she said of the closed ledger cards: "We dumped them." Evidence was adduced by the Commonwealth at trial from which the jury could have found that Leavitt directed destruction of inculpatory closed ledger cards after she had received the subpoena from the grand jury.

The focus of the grand jury's investigation was the receipt and retention by HES of excess payments for equipment sold or leased. To that inquiry the closed ledger cards were highly relevant. As to each patient account, HES set up a ledger card on which charges and receipts were entered. If, as happened, a duplicate or excess payment was received for the account of a patient (generally from a third-party payor, such as Medicaid), the overpayment would show on the patient's ledger card as a credit balance. Former bookkeepers at HES testified that they had been, with some frequency, directed by Leavitt to write off credit balances on accounts which had become inactive; i.e., HES would pocket the overpayments. It was the practice to indicate the closing of an individual account by drawing a double line and "zeroing out" the balance by writing off a debit or credit as the case might be. Thus, the closed ledger cards would display more prominently than any other record the writing off of a credit balance created by an excess payment.

We turn to the several issues on appeal. One requires reversal of the judgment of contempt. We affirm the judgment of perjury.

1. *The sufficiency of the indictment for contempt.* Leavitt argues that the indictment for contempt stated the crime charged in too broad, too generic a fashion; it failed to descend to particulars. See *Russell* v. *United States*, 369 U.S. 749, 765 (1962). Contempt of a judicial proceeding by means of interference and obstruction is not an unknown offense. *Hurley* v. *Commonwealth*, 188 Mass. 443, 446-448 (1905). *Commonwealth* v. *McNary*, 246 Mass. 46, 50-51 (1923). *Opinion of the Justices*, 301 Mass. 615, 618 (1938). Smith, Criminal Practice and Procedure § 768 (2d ed. 1983).[4] As amplified by the particulars, the indictment adequately informed the defendant of the charges against her and gave her a reasonable opportunity to meet them. *Dolan* v. *Commonwealth*, 304 Mass. 325, 337-338 (1939) ("The complaint together with these particulars fully advised the defendant of the nature of the offense charged against him, and advised him of the facts relied on as constituting such offense in sufficient detail to give him reasonable knowledge of the grounds of the charge and reasonable opportunity to meet such charge"). *Miaskiewicz* v. *Commonwealth*, 380 Mass. 153, 156 (1980). See *Commonwealth* v. *Hobbs*, 385 Mass. 863, 869 (1982). It cannot be a coincidence that the trial which ensued focused precisely on the destruction or withholding of the records to which the particulars had adverted. Technical nicety has not been demanded in the pleading of contempt. *Miaskiewicz* v. *Commonwealth, supra* at 156.

In a variation on the vagueness theme, the defendant suggests that a difficulty with a contempt indictment phrased in a general manner is that the special grand jury which handed up the indictment might have had one set of contumacious acts in mind while the Attorney General contem-

---

[4] For discussions of the criminal nature of contempt of court and its common law antecedents, see *Gompers* v. *United States*, 233 U.S. 604, 610-611 (1914); *Bloom* v. *Illinois*, 391 U.S. 194, 201 (1968); *United States* v. *Williams*, 622 F.2d 830, 836-837 (5th Cir. 1980).

plated a quite different set when framing the bill of particulars. We have been referred to no grand jury minutes suggesting that such a variance in fact occurred and are not prepared to speculate that it did.

2. *Whether the indicting grand jury was properly constituted.* (a) More than one special grand jury investigated Medicaid fraud during the 1980-1981 period in which Leavitt's case developed.[5] A special grand jury convened November 15, 1979, in accordance with G. L. c. 277, § 2A, as amended by St. 1979, c. 344, § 29, was extended, upon application of the Attorney General, pursuant to G. L. c. 277, § 1A, inserted by St. 1952, c. 494. Before that extended grand jury concluded its business, another special grand jury was convened to investigate Medicaid fraud. It was the latter grand jury before which Leavitt appeared. Pointing to the command in § 1A that an extended grand jury shall serve until the investigation "has been completed and shall take up no new matter," Leavitt asserts that a special grand jury may not lawfully be constituted to investigate Medicaid fraud, albeit quite different suspected instances of it, for as long as another grand jury is working on Medicaid fraud, i.e., the same generic subject. She buttresses her contention with the second paragraph of § 1A, which provides that a grand jury may be impanelled "whose duty shall include all business not then before the grand jury continued under authorization of this section."

The argument tortures a statutory provision designed to keep a special grand jury from sitting indefinitely into a requirement which accomplishes the opposite result. We think it plain that the prohibition in § 1A against taking an extended grand jury into new matter does not preclude convening a new grand jury to consider a similar subject. Medi-

---

[5] The record disclosed the convening of two special grand juries to investigate Medicaid fraud, and the defendant's brief refers to the grand jury before which she appeared as the "second special grand jury." The Commonwealth notes in its brief that three earlier special grand juries had been convened to investigate Medicaid fraud, thus making the indicting grand jury in this case the fourth special grand jury.

caid is a vast program involving a large number of providers of care, services, and, as in this case, durable equipment. Such is the scope of activity that the Attorney General has established a separate Medicaid Fraud Control Unit. For some sense of the scale on which Medicaid providers are monitored, see *Stornanti* v. *Commonwealth*, 389 Mass. 518, 522-524 (1983). It is hardly plausible that any single special grand jury must sit to exhaust the subject of Medicaid fraud or that investigation must be suspended until a grand jury looking into that general topic has been discharged. The new matter which an extended grand jury is to be spared is that which would lead to the presentment of an indictment based on a set of particular facts different from that considered by the grand jury prior to its extension. Cf. *Commonwealth* v. *England*, 350 Mass. 83, 84 (1966). Reciprocally, a successor grand jury is free to look into any matter not the subject of proceedings leading to a particular presentment before the prior grand jury. There was no showing that Leavitt's appearances were anything other than before the same special grand jury. If it were otherwise, it is a circumstance as to which she has peculiar competence to provide the information.

(b) Perjury, as a statutory matter, occurs in the context of "a judicial proceeding or in a proceeding in a course of justice." G. L. c. 268, § 1. Grand jury proceedings are, of course, judicial proceedings. See *Commonwealth* v. *McNary*, 246 Mass. at 50; *Matter of Pappas*, 358 Mass. 604, 613 (1971). The parties stipulated (among other things) that a special grand jury was created June 9, 1980; it issued a subpoena to Leavitt, requiring her to bring certain books and records.[6] It was nowhere proved, the defendant argues, that the grand jurors took their statutory oath (G. L. c. 277, § 5). Therefore, the argument continues, it was not estab-

---

[6] The members of the trial jury also had before them the Attorney General's certificate of public necessity, the subpoena calling for Leavitt's appearance before the grand jury, an order of a Superior Court judge denying a motion to quash the subpoena, and a stipulation that Leavitt was sworn prior to testifying before the grand jury.

lished that the special grand jury was lawfully convened and that false statements were made under oath in a judicial proceeding. To this strictissimi juris argument it is sufficient to answer that: on the face of the indictment for perjury the special grand jury presented it "on their oath"; the stipulation as to the creation of the special grand jury implies it was lawfully done; and there is a presumption that the acts of public bodies are regular and lawful. *Robie* v. *Massachusetts Turnpike Authy.*, 347 Mass. 715, 725 (1964), and cases there collected. Cf. *Patry* v. *Liberty Mobilhome Sales, Inc.*, 15 Mass. App. Ct. 701, 703 (1983).

3. *Evidence of double payments.* Largely through the testimony of former bookkeepers of HES, the government introduced evidence at trial of retention of double payments or overpayments by HES. The defendant protests that this constituted erroneous admission of evidence of other crimes. *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978). *Commonwealth* v. *Sawyer,* 389 Mass. 686, 696 (1983). *Commonwealth* v. *Grammo,* 8 Mass. App. Ct. 447, 454 (1979). Those decisions rest on the principle that a defendant ought not to have to answer for offenses not set forth in the indictment. If, however, evidence of another offense is relevant to show something other than bad character or propensity of the accused, it is admissible. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973) (prior acts relevant to state of mind of victim and probative of crime charged). *Commonwealth* v. *Caine,* 366 Mass. 366, 370-371 (1974) (theft of gun one week before murder probative of means to commit crime and premeditation). *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269 (1982) (prior acts evidence of desperation). *Commonwealth* v. *Kines,* 5 Mass. App. Ct. 632, 634 (1977) (evidence of modus operandi). See also *Commonwealth* v. *Sawyer,* 389 Mass. 686, 698 (1983); Liacos, Handbook of Massachusetts Evidence 418 (5th ed. 1981).

Here the double payments and writing off of resulting credit balances bore materially on Leavitt's motives for lying about the closed ledger cards, which graphically disclosed

how excess payments were cancelled by arbitrary debits, rather than returned. Those excess payments also explained destruction of closed ledger cards and the adding machine tapes, both of which highlighted the manner in which credit balances in favor of individual patients were eliminated by means other than refunds. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 8, cert. denied, 429 U.S. 1049 (1976); *Commonwealth* v. *St. Germain*, 381 Mass. 256, 271 (1980). Once relevance is established, the decision whether, notwithstanding, the evidence of other wrongdoing[7] should be admitted rests in the sound discretion of the judge. *Commonwealth* v. *Hoffer*, 375 Mass. 369, 373 (1978). *Commonwealth* v. *Doyle*, 5 Mass. App. Ct. 544, 548 (1977). There was no abuse of discretion. It would have been hard for the jury to understand the case without explanation of the relation of the closed ledger cards to evidence of retention of double or excess payments. Cf. *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981).

The defendant incorporates in her argument about the impropriety of admitting evidence of double payments a contention that the sting of this evidence would have been less damaging had the larceny charge been joined for trial and had she, thus, been able to defend against the evidence of retention of double payments. The logic is not compelling. It was open to Leavitt to try to show that she was entitled to write off the credit balances and that the missing documents were immaterial. In any event, it is enough to say that Leavitt never moved to join the larceny indictment for trial under either Mass.R.Crim.P. 9(a)(3) or (4), 378 Mass. 859 (1979).

4. *Admission of order refusing to quash grand jury subpoena.* As probative on the issue of contempt, the trial judge admitted an order by another Superior Court judge who earlier had refused to quash or modify the grand jury's subpoena to Leavitt. In that order the judge had found that

---

[7] Leavitt, at the time of trial, had been convicted of no crime — it was left to the jury to infer that the retention of double Medicaid payments wasn't cricket.

"[t]he materials summonsed are relevant and material" to the investigation. Relying on *Commonwealth* v. *McDuffee*, 379 Mass. 353, 364-365 (1979), which held that materiality of false testimony in a perjury trial is a question for the jury, the defendant argues that admission of the court order erroneously took the issue of materiality away from the jury.

What that argument neglects is that the trial judge, immediately upon receipt of the court order in evidence, gave a limiting instruction to the jury explaining: that the order was admitted solely in relation to the charge of contempt; that the motion judge had used the word material in a sense different from that which the jurors were to consider in relation to the charge of perjury; and that he would instruct the jury later about the meaning of the word "material" in connection with the perjury charge. The limiting instruction was somewhat diffuse, but the jury would have grasped the basic point, that the motion judge's order did not bear on the perjury aspect of the case. In his final instruction, the judge unmistakably put to the trial jury the issue of materiality of Leavitt's statements to the grand jury:

> "And, lastly, was it material to the point at hand. And what does material mean? That it had relevancy, that it had probative value to the point in hand, to the inquiry that the Grand Jury, that the Special Grand Jurors were making. If the Commonwealth has satisfied you beyond a reasonable doubt as to each of those five essential elements [of perjury] and you are satisfied, and find that Regina Leavitt made a false statement under oath in a judicial proceeding that was wilful and voluntary and material to the issue at hand, then you shall find Regina Leavitt guilty as charged. If the Commonwealth has not so satisfied you as to each and all and every one of those five elements, then you shall find this defendant not guilty, and say no more."

5. *Jury instructions.* We can dispose relatively quickly of one of the claims of error arising from the judge's charge to

the jury. As a prelude to his discussion of presumption of innocence, the judge offered the following embellishment: "We have all heard that phrase. Some of us heard it more than a few years ago in civic[s] classes and grade school. We have heard it, sadly, in the national scandals of a few years ago and in the periodicals, presumption of innocence."

Had the judge stopped at that point there might be something to the defendant's argument that the judge had subjected the idea of presumption of innocence to derision and had burdened the presumption of innocence by linking it to the Watergate defendants, many of whom were found guilty. But the judge did not stop at that point; rather he explained at length, and in the most unmistakable terms, the place of the presumption of innocence in our jurisprudence and the burden of the Commonwealth to establish each element of a crime charged beyond a reasonable doubt. Read in context, the judge's comments were a melancholy reflection that the concept of presumption of innocence had been trivialized by certain current events and attendant press coverage. His observation was set up in counterpoint to what he then instructed the jury, viz., that the presumption of innocence is a fundamental right, to be taken seriously, and to be overborne only by proof beyond a reasonable doubt.

A second objection to the instructions, satisfactorily recorded on the record, properly protests that the trial judge gave the jury too expansive and vague a definition of the crime of contempt of the grand jury. Rather than confining himself to the particularized instances of interference and obstruction with which Leavitt had been charged and which were the subject of the trial, i.e., destruction of closed ledger cards, removal and destruction of adding machine tapes, and the nonproduction of certain records, the judge repeatedly lapsed into abstractions which could have misled the jury. He spoke of contempt as undertaking "some act, some course of conduct . . . any series of activities . . . The course of conduct that the Commonwealth must prove beyond a reasonable doubt is misbehavior."

"Now, when I use the term 'misbehavior,' what I mean is that the Commonwealth must show conduct which is inappropriate, given the grand jury's function and purpose . . . ."

"Was the act or course of conduct, if any act or course of conduct there be, was that act or behavior, given all of the circumstances as you find them to have been, inappropriate to the function of the Special Grand Jury's investigation?"

To be sure, the judge told the jury that "the conduct proved must rise to the level of being a material obstruction." He explained that being somewhat tardy, making a disapproving gesture such as spitting or thumbing the nose, while it might show disrespect, would not be the significantly impeding conduct which was charged. He never sharpened the focus of that portion of his charge, however, and returned to the theme of "a course of conduct in a manner inappropriate, given the duty and purpose of the Special Grand Jury."

Following completion of the charge, defense counsel objected to the generality of the instruction on contempt and also requested the judge to read the bill of particulars. The judge did so, but then (having been encouraged to do so by the prosecutor) undid what might have been a saving measure by adding:

"Other acts, if any other acts there be, any other conduct of the defendant may be utilized by you in the sense that it may, it may have — and it may not — if any other activities there be, it may have some probative value to the question of her contempt."

An effect of a bill of particulars is to restrict the scope of the indictment and the proof offered in support of it. *Commonwealth* v. *Albert,* 307 Mass. 239, 243 (1940). *Commonwealth* v. *Iannello,* 344 Mass. 723, 726 (1962). *Commonwealth* v. *Hare,* 361 Mass. 263, 270 (1972). Smith, Criminal Practice and Procedure § 1296 (2d ed. 1983). After considering the instructions in their totality, we are of opinion that the jury were left free to consider acts of the defendant outside of the bill of particulars as misbehavior or improper conduct which constituted contempt, for example:

her instructions to bookkeepers in her company to write off excess payments or her delay in producing the sales adjustment and cash receipts journals. We think the charge was "substantially misleading as to a salient point" of the contempt portion of the case. *Commonwealth* v. *Benders,* 361 Mass. 704, 708 (1972). Cf. *Commonwealth* v. *Brattman,* 10 Mass. App. Ct. 579, 584 (1980). Contrast *Commonwealth* v. *Perez,* 390 Mass. 308, 313 (1983); *Commonwealth* v. *Lutz,* 9 Mass. App. Ct. 357, 361-362 (1980).

No imperfection attended the instruction on perjury. Accordingly, the judgment founded on the indictment for perjury is affirmed. The judgment founded on the indictment for contempt is reversed and the verdict of guilty of contempt is set aside.

*So ordered.*

BROWN, J. (concurring). Collateral to this appeal is defense counsel's claim that, because of the defendant's mental illness, penal incarceration is an inappropriate — indeed, dangerous — consequence for her.[1] Counsel appears to suggest that this court should reverse Leavitt's conviction simply to facilitate the fashioning of a new sentence that will take into account "the reality . . . of . . . [her] mental illness."

The defendant may well be mentally ill, and in need of treatment. The Legislature has provided some measure of help for mentally ill prisoners. Such treatment is available now to this defendant as to any other convicted defendant. See G. L. c. 123, § 18. Nevertheless, I am always amazed how those accused of so-called "white-collar" crime have the compelling need to state, at the moment when they stand convicted before the bar of justice, how and why their socio-

---

[1] "[I]t is not a function of this court to review an otherwise lawful sentence which is within the limits of the applicable statutory provisions. Such a review, if it is available, is by the Appellate Division of the Superior Court acting pursuant to G. L. c. 278, §§ 28A-28C." *Commonwealth* v. *Franks,* 365 Mass. 74, 81 (1974).

economic status has prepared them so poorly for any period of incarceration. The point is often pressed that it is not in society's best interests to remove such "valuable" people from the mainstream of life, and place them in an environment populated only by "common" criminals. I have never been impressed by those arguments, as I see these defendants as what they are: convicted felons.

It is understandable that McLean Hospital or some other "facility of choice" would be a more desirable place to serve a sentence than one of the Commonwealth's correctional institutions. To be sure, neither M.C.I., Framingham, nor M.C.I., Walpole, has ever been mistaken for a country club. But that is not the way the system is supposed to work. Doctors, lawyers, judges, nursing home operators, merchants, politicians, and other professionals must not be encouraged to believe that there is one standard for them and another for those involved in so-called "street crime." A pen in the hand of a defrauding provider of services to the public may well be as dangerous and damaging to society as a gun in the hand of a robber. For our system to be perceived as fair, as well as to operate fairly, we must not treat the two differently. Or, to put it more colloquially, "Don't do the crime, if you can't do the time."[2]

---

[2] Ames, Baretta's Theme (Leeds Music Corporation and Dutchess Music Corporation, Melville, New York, 1975).