Leavitt v. McLean Hospital Corp.

EDWARD E. LEAVITT & another[1] vs. MCLEAN HOSPITAL
CORPORATION & others.[2]

Worcester. April 10, 1990. - May 23, 1990.

Present: Brown, Kass, & Jacobs, JJ.

*Mental Health. Practice, Civil*, Commitment of mentally ill person.

Where a woman who had fled following her convictions of certain criminal
  offenses and been apprehended at a private mental hospital to which
  she had voluntarily committed herself was later, following a hearing
  before a Superior Court judge, committed to the same hospital for
  twenty days on a commitment order having a G. L. c. 123, § 15(*e*),
  component, rather than to a less costly State institution, and where it
  appeared that the commitment was directed primarily to the benefit of
  the patient rather than to any public interest, the Commonwealth was
  not liable for the costs attributable to the commitment. [601-602]

CIVIL ACTION commenced in the Superior Court Department on April 9, 1985.

The case was heard by *Elbert Tuttle*, J., on a motion for partial summary judgment; a motion for the assessment of damages was heard by *Gerald F. O'Neill, Jr.*, J., and a final judgment was entered by him.

*Sandra L. Hautanen*, Assistant Attorney General, for the Commonwealth.

*Joseph J. Wadland* for the defendant.

BROWN, J. After conviction of certain criminal offenses (see 17 Mass. App. Ct. 585 [1984]), Regina Leavitt fled the jurisdiction prior to sentencing. She was later apprehended at McLean Hospital, a private mental hospital in the Commonwealth, where on March 29, 1982, she had voluntarily committed herself. See G. L. c. 123, § 10. Following a hearing

---

[1] Regina Leavitt.

[2] Commonwealth of Massachusetts, Blue Cross of Massachusetts, Inc., and Blue Shield of Massachusetts, Inc.

before a Superior Court judge, she was committed to Mc-
Lean Hospital for twenty days. Regina stayed at McLean
Hospital for a total of 110 days. The hospital sought and re-
ceived reimbursement from Regina's insurer for sixty days
— the maximum benefit payable under the policy. Regina's
husband, Edward, also made a partial payment. After the
hospital obtained an execution against them for the balance
due, the Leavitts brought this action, seeking a declaration
that the costs attributable to the commitment should be paid
for by the Commonwealth. The Commonwealth has taken an
appeal from the judgment of a second Superior Court judge
ordering the Commonwealth to pay McLean Hospital an
amount of money representing the costs associated with Re-
gina's stay and treatment at that facility during the period
April 1, 1982, to April 22, 1982.

The Commonwealth denies liability, asserting instead that
the obligation is Regina's. Resolution of that issue requires a
rather detailed examination of the proceedings. The record
indicates that the Commonwealth initially sought to have
Regina held without bail until the sentence could be im-
posed. Regina's attorney, on the other hand, argued for con-
tinuation of commitment to McLean Hospital. Representing
that Regina was suicidal and in need of "intensive ongoing
treatment," the attorney requested of the judge, "just cutting
through the legalities for one moment, . . . to regard this case
as an emergency situation, to recognize the fact that she is in
a locked ward under a ten-day order of commitment,[3] al-
low that to continue undisturbed." Responding to the Com-
monwealth's position that she be in a "secure facility," Re-
gina's attorney pointed out that under G. L. c. 123, § 1,
McLean Hospital was such a facility, and he reiterated the
concern that she be in McLean Hospital. "We take no posi-
tion as to whose custody she need be under, so long as the
result is that she be in McLean Hospital. . . . All we're ask-
ing is a ten-day preservation of the status quo." Regina's at-

---

[3]See G. L. c. 123, § 12. Apparently, the initial voluntary (§ 10) commit-
ment was superseded by an involuntary (§ 12) commitment prior to the
time of the hearing.

torney also pointed out that, if the judge preferred, she could be committed pursuant to G. L. c. 123, § 15(*e*), since "her medical condition . . . renders her incompetent for purposes of sentencing."[4]

When the judge indicated a willingness to order a twenty-day commitment under § 15, however, Regina's attorney indicated that it was "unclear at this point whether McLean can accept a patient solely on a § 15. I think it would avoid problems if we could have, in effect, a double commitment; that is, the pink paper [§ 12] commitment, which would result in McLean accepting her, and then the order that she be examined while under the pink paper commitment at McLean." The judge agreed to the double commitment and arranged for the commitment papers to be drawn up.[5] The psychiatrist in charge of the short-term treatment unit at McLean Hospital was present at the hearing and was thus privy to the arrangements. Typed on the commitment form, presumably to explain the reason for the commitment, was the following: "Further evaluation and treatment for suicidal tendencies and depression needed."

---

[4]G. L. c. 123, § 15(*e*), as inserted by St. 1970, c. 888, § 4, provides in relevant part as follows: "After a finding of guilty on a criminal charge and prior to sentencing, the court may order a psychiatric or other clinical examination and, after such examination, it may also order a period of observation in a facility. . . . The purpose of such observation or examination shall be to aid the court in sentencing."

[5]If a G. L. c. 123, § 15(*e*), commitment was intended, the form used should have been better chosen. There was no mention on the form — either blank or as completed — of § 15(*e*). Entitled "ORDER OF COMMITMENT OF A DEFENDANT FOR OBSERVATION (Under Section 15(b), Chapter 123, General Laws)," the form purported to invoke § 15(*b*). That section did not apply to this case since it does not deal with issues presented by a defendant awaiting sentencing but instead provides for commitment "in order to determine whether mental illness or mental defect have so affected a person that he is not competent to stand trial or not criminally responsible for the crime or crimes with which he has been charged." G. L. c. 123, § 15(*b*), as appearing in St. 1971, c. 760, § 12. Perhaps for this reason, virtually all of the provisions that tied the form to the statutory language of § 15 were struck as inapplicable, leaving the statutory ground for the commitment unclear. It should also be noted that there was no explicit indication on the form that the commitment was to be a double commitment.

Relying on G. L. c. 123, § 33,[6] the second judge concluded that the Commonwealth was liable for the expenses incurred during the twenty-day commitment at McLean Hospital. In his memorandum of decision, the second judge stated that, "[w]hile the statute [§ 33] acknowledges that certain commitments will not be paid for by the Commonwealth, this does not apply to a commitment made pursuant to G. L. c. 123, § 15(e). . . . Such commitments forward the administration of public justice and any benefit to the person committed is only incidental. The commitment . . . clearly represents a commitment designed to aid the court in sentencing Leavitt. Until her alleged suicidal behavior could be more fully evaluated and, if found to exist, stabilized, she was in no condition to be sentenced."

To a certain extent, our reading of the statute comports with that of the second judge: § 33 merely sets forth the procedures to be followed when payment is to be made by the Commonwealth and does not impose an obligation to pay the expenses in every case. This is made clear by the fourth sentence of § 33, which provides: "If application is made for the commitment of a person whose expenses and support are not to be paid by the commonwealth, said expenses shall be paid by the applicant or by a person in his behalf." See also G. L. c. 123, § 32.

It does not necessarily follow, however, that the Commonwealth should pay for every commitment that has a § 15(e)

---

[6]General Laws c. 123, § 33, as amended by St. 1978, c. 478, § 71, provides in part as follows: "All necessary expenses attending the apprehension, examination, hearing, commitment or delivery of a mentally ill person . . . shall be allowed and certified by the judge, if said person is committed pursuant to this chapter, and presented as often as once a year to the comptroller, who shall examine and audit the same. Necessary expenses attending the apprehension, examination or hearing of any person sought to be committed pursuant to this chapter but not so committed shall be so presented, examined, and audited if they have been allowed in the discretion of the judge and certified by him. All expenses certified, examined and audited as provided in this section shall be paid by the commonwealth. If application is made for the commitment of a person whose expenses and support are not to be paid by the commonwealth, said expenses shall be paid by the applicant or by a person in his behalf."

component. Recall that this was supposedly a "double commitment." The record shows that, as a result of the first judge's order, Regina was able to avoid being incarcerated or transferred to a less costly State institution and was able to continue receiving psychiatric treatment for her depression and suicidal tendencies. The commitment also had the effect of postponing sentencing. These results all benefited Regina, and any aid to the court for purposes of sentencing under G. L. c. 123, § 15(*e*), was, at best, secondary.[7]

We think it implicit in § 33 that those costs directed primarily to the immediate benefit of the individual patient, rather than to the public interest, should be charged to the patient.[8] As we have indicated, it fairly may be said that Regina's commitment to McLean Hospital, rather than to a less costly State institution, was effected at the behest of Regina's attorney as an accommodation to her and may even have been a strategy to avoid incarceration. It follows that the commitment was primarily for the benefit of the patient rather than for any public interest, and no liability accordingly may attach to the Commonwealth. The judgment on Count I of the second substitute complaint is vacated, and a new judgment is to enter declaring the parties' rights in accordance with this opinion.

*So ordered.*

---

[7]Although it is not necessary to our decision, we observe that it is questionable whether resort to § 15 was appropriate in this case. Surely judges are not without authority to fashion relief where a defendant is (to quote Regina's attorney and the second judge) "incompetent for purposes of sentencing" or "in no condition to be sentenced," but § 15(*e*) speaks to "observation or examination . . . to aid the court in sentencing." It is difficult to see how such a postponement aids anyone other than the defendant. Perhaps this dispute could have been avoided if the first judge had not used such an ill-fitting hook on which to hang his order.

[8]We do not read *Northampton State Hosp.* v. *Moore*, 369 Mass. 957 (1975), as indicating anything to the contrary. See generally Note, Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1365-1372 (1974).